NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JESSICA FERGUS, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Civil No.: 16-cv-3335 (KSH) (CLW) |
| v. | |
| IMMUNOMEDICS, INC., CYNTHIA L. SULLIVAN, PETER P. PFREUNDSCHUH AND DAVID GOLDBERG, | **OPINION** |
| *Defendants*. | |

**Katharine S. Hayden, U.S.D.J.**

## I.      Introduction

Defendants Immunomedics, Inc., Cynthia L. Sullivan, Peter P. Pfreundschuh, and David Goldenberg have moved to dismiss the consolidated complaint of plaintiff Sensung Tsai ("Tsai") in this putative class action brought under the federal securities laws, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. The motion is fully briefed (D.E. 25, 27, 28), and the Court decides it without oral argument.  *See* L. Civ. R. 78.1.

## II.      Background

By way of overview, Tsai contends that Immunomedics, a biopharmaceutical company, and three of its now-former executives made a series of false or misleading statements and material omissions in 2016 about the company's plans to participate in a key industry conference in an alleged plot to drive up the company's stock price, find a licensing partner for its flagship cancer drug candidate – called sacituzumab govitecan ("IMMU-132") – and reap the resulting profits. Tsai asserts that defendants' conduct caused the putative class members (including him)

to purchase Immunomedics securities at artificially inflated prices and to suffer losses when the stock price dropped after one of the company's presentations at the conference was cancelled. He brings this putative class action on behalf of all investors who purchased or otherwise acquired Immunomedics securities between April 20, 2016 and June 24, 2016 (the "class period").

The consolidated complaint (D.E. 15) sets the stage for Tsai's claims as follows.[1] Immunomedics, based in Morris Plains, New Jersey, was founded by individual defendant David Goldenberg in 1982 and focuses on novel immunotherapeutics for the treatment of cancer, autoimmune and other serious diseases, relying on the development of monoclonal antibody-based products to do so. (Compl. ¶¶ 2, 24, 37.) Its stock trades on the Nasdaq stock exchange. (*Id.* ¶ 24.) The company's "core operation" during the class period was its antibody-drug conjugate ("ADC") business, and the "lead product candidate" within the ADC business was IMMU-132. (*Id.* ¶¶ 3, 53.) Commercialization of IMMU-132 is critically important to the company's success. (*Id.* ¶ 53.)

In addition to founding the company, Goldenberg served as chairman, chief medical officer, chief scientific officer, and chief patent officer until his resignation was announced on May 3, 2017. (*Id.* ¶ 28.) Cynthia Sullivan, Goldenberg's wife, was the president and chief executive officer until her resignation was announced, also on May 3, 2017. (*Id.* ¶ 25.) According to the complaint, Goldenberg and Sullivan were "forced out" of their roles on January 1, 2017. (*Id.* ¶ 16.) Peter Pfreundschuh was the company's chief financial officer from September 2013 through his resignation on June 16, 2016 (which was announced on June 21,

---

[1] The complaint's factual allegations are taken as true for purposes of this motion only and this recitation does not represent findings by the Court.

2016), and served as a consultant to the company from June to August 2016. (*Id.* ¶¶ 27, 105.)[2]

The statements and omissions Tsai alleges are actionable began on April 19, 2016, and centered upon the June 2016 annual meeting of the American Society of Clinical Oncology, or ASCO. (*See id.* ¶¶ 4-13, 77.) ASCO is a non-profit organization founded in 1964 by physicians from the American Association of Cancer Research, and its mission is to "conquer cancer 'through research, education, and promotion of the highest quality patient care.'" (*Id.* ¶ 57 & n.9 (quoting ASCO website).) ASCO's annual meetings are among the largest and most prominent cancer conferences worldwide, and are of great interest to industry watchers. (*Id.* ¶¶ 5, 58-59.) In submitting abstracts to be considered for presentation at the meeting, candidates must agree to keep the information in their submission confidential and represent that the content and data are new and "never-before-seen." (*Id.* ¶¶ 7, 9.) By submitting an abstract to ASCO, the "author, co-authors, sponsor of the research, journalists and others" are prohibited from (a) making the information public or giving it to others who may make it public, (b) publishing or presenting the information or giving it to others who may do so, or (c) using the information to trade in the securities of an issuer or giving it to others who may use it to trade. (*Id.* ¶¶ 9, 72.) The complaint refers to this as the "ASCO embargo." (*Id.* ¶ 7.)

The confluence of these factors leads to the so-called "ASCO effect," whereby anticipation about presentations to be made at the annual meetings triggers a surge in stock price for some companies:

> The ASCO annual conference is closely monitored by the biotechnology industry. Each year, several biotechnology companies working on oncology therapies see a massive surge in their stock prices starting with the announcement of abstracts being accepted for presentation, typically weeks or sometimes a few months before the ASCO meeting and fueled by investors' hopes that their pick will be

---

[2] The reason for the executives' departures, including whether they were related to the events plaintiff challenges, is not set forth in the complaint.

amongst the ones that will steal the show at this year's meeting and attract further investors or suitors to the company. This stock price surge typically lasts from the announcement until weeks after the presentation and the annual conference are over, and the impact is digested. Investors know that pursuant to the norms set by ASCO, the new research to be presented at the conference is embargoed until the event starts. The embargo creates suspense among the investment community and attracts a lot of investors, as there are significant gains achievable with mitigated risk if the event is traded correctly. Biotech investors are well aware of this recognized effect – called the "ASCO Effect."

(*Id.* ¶ 59; *see also id.* ¶ 5.)

According to the complaint, defendants were well aware of the ASCO effect, and sought to exploit it to secure a licensing partner for IMMU-132 and enrich themselves. In February 2016, Immunomedics submitted "at least two" abstracts on IMMU-132 for presentation at the ASCO annual meeting in June; Goldenberg was listed as an author on each. (*Id.* ¶ 70.) In making these submissions, defendants were aware of the confidentiality policy or "embargo" and restrictions on use or disclosure, and knew that ASCO could exclude an accepted abstract from presentation if information or data were disclosed before the meeting. (*Id.* ¶¶ 71-73.)

In a series of statements in April and May 2016, defendants touted the news that three of their submissions to ASCO had been accepted for the June 2016 meeting: an abstract on treatment of triple-negative breast cancer (TNBC) with IMMU-132 to be presented on June 3, 2016, a poster session on IMMU-132 and small-cell lung cancer (SCLC) on June 4, 2016, and an abstract on non-small-cell lung cancer (NSCLC) to be presented on June 6, 2016. (*Id.* ¶ 6.) They also touted that results concerning the use of IMMU-132 for TNBC had been accepted for a "Best of ASCO conference" to be held later that month. (*Id.* ¶¶ 6, 51.)[3] Tsai challenges the following statements relating to these presentations as actionable under the Exchange Act:

[3] In paragraph 6, the complaint states that the "Best of ASCO" presentation was to be made on July 24th. All other references to Best of ASCO describe it as a June 2016 event. (*E.g.*, ¶¶ 13, 51, 83.) Accordingly, the Court uses the June date.

- On **April 19, 2016,** Immunomedics issued a press release announcing that IMMU-132 produced "meaningful clinical benefit" to certain patients with metastatic urothelial cancer. The press release included a statement by Sullivan that "[u]pdated results in triple-negative breast and non-small-cell lung cancers will be presented at two Clinical Science Symposia during the upcoming ASCO Annual Meeting in June." (*Id.* ¶ 77.)

- On **May 2, 2016,** a press release announced that the company's abstract on IMMU-132 use in patients with TNBC had been selected for the Best of ASCO program to be held on June 24-25, 2016. (*Id.* ¶ 83.) Selection for Best of ASCO is, according to Tsai, "a highly coveted and prestigious honor." (*Id.* ¶ 84.)

- On **May 4, 2016,** in a press release concerning third quarter results and clinical developments, Pfreundschuh stated that "[k]ey updates in triple-negative breast cancer, as well as non-small-cell and small-cell lung cancers will be provided at ASCO next month." (*Id.* ¶ 87.) The press release also stated, under "[t]he Company's key clinical developments and future planned activities," that "[u]pdated Phase 2 results in patients with metastatic triple-negative breast cancer will be presented in a Clinical Science Symposium Session at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting on Friday, June 3, 2016." (*Id.*).[4]

- On **May 5, 2016,** during a conference call with securities analysts, Sullivan reiterated that ASCO had selected the TNBC IMMU-132 abstract for the Best of ASCO program. She also stated, as to the ASCO annual meeting, that the company's "oral presentation on TNBC will be at a Clinical Science Symposium Session on breast cancer," and that the abstract regarding patients with NSCLC had been selected for oral presentation at another Clinical Science

---

[4] The complaint also cites the filing of a "Current Report on Form 8-K" on the same day as this press release (*id.* ¶ 87), but does not challenge its content (assuming that content differed from the substance of the press release).

Symposium session focusing on lung cancer. (*Id.* ¶ 89.) Goldenberg also said, regarding overall survival rates, "we hope to update these results at the forthcoming Annual Meeting of the American Society of Clinical Oncology or ASCO, where [indiscernible] will make an oral presentation on our results in TNBC. [. . . ] [R]esults in non-small cell lung cancer patients also will be updated in ASCO[.]" (*Id.* ¶ 91 (alterations in original).) Goldenberg further stated, also presumably concerning NSCLC survival, that "[t]his trial will also be updated at ASCO." (*Id.*)

- On **May 19, 2016,** a press release stated that ASCO had "selected two of the Company's abstracts for oral presentation at two Clinical Science Symposium Sessions during their 2016 Annual Meeting," both on IMMU-132, the first a "Late-Breaking Abstract on updated results from a Phase 2 study of the ADC in patients with metastatic TNBC," which had also been selected for the Best of ASCO program. (*Id.* ¶ 94.) The press release also stated that "[r]esults in patients with metastatic non-small-cell lung cancer will be updated in another Clinical Science Symposium Session that focuses on lung cancers," and that in addition to the two oral presentations, "a poster presentation of results with [IMMU-132] in patients with metastatic small-cell lung cancer will also be given." (*Id.*)

Despite these statements and the ASCO embargo, defendants had already presented data at an earlier conference, data Tsai alleges was the same as what defendants were supposed to present at the ASCO annual meeting and at Best of ASCO. (*Id.* ¶ 8.) Specifically, Goldenberg presented the same or substantially the same IMMU-132 "data, information, content or conclusions at PEGS Boston 2016" – a different industry conference – in late April 2016; had discussed details of the Boston presentation on the May 5, 2016 conference call with securities analysts; and had published the Boston presentation on the company website. (*Id.* ¶¶ 10, 98.) These disclosures, Tsai alleges, made the April 19, May 2, May 4, May 5, and May 19

statements false or misleading or omitted material information necessary to make them not misleading because the Boston presentation and other statements violated the ASCO embargo, risking exclusion from the ASCO annual meeting, and defendants knew it. (*Id.* ¶¶ 79, 86, 88, 90, 93, 96, 98.) The complaint further alleges that after the challenged statements were made, and as the ASCO meeting date approached, Immunomedics' share price increased. (*Id.* ¶ 78, 81, 85, 92, 95, 97).

Although defendants issued a press release on April 29, 2016, citing Goldenberg's presentation in Boston of "updated, interim Phase 2 results" for IMMU-132 and discussing "in detail" other data and results," it did not state that the information and results "were the same as the information and results to be presented at ASCO." (*Id.* ¶ 80; *see also id.* ¶ 82.)

By June 3, 2016, ASCO canceled Immunomedics' anticipated presentation of its TNBC abstract at the annual meeting. (*Id.* ¶¶ 11, 99.) Immunomedics announced this development in a press release, also dated June 3, stating that it was

> advised late yesterday that its abstract, "Therapy of refractory/relapsed metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results," planned for oral presentation today and selected by [ASCO] for its Press Briefing, was cancelled because of a complaint that the Company violated the embargo by reporting results presented by its Chairman at a conference in April. It appears the complaint was made by a third party contacting ASCO. No question was raised on the quality of the results. Immunomedics President and Chief Executive Officer, Cynthia L. Sullivan, remarked: "The presenter, Dr. Bardia, and I are attempting to reverse this with ASCO because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February . . . ."

(*Id.* ¶ 100.) The complaint alleges that this statement was false because "the data, results, information, content or conclusions were not materially different, and because the presenter, Dr. Bardia, had not been told that the data had been previously presented and had no belief, as stated in the press release, that the patient population and results reported in April" were different. (*Id.*

¶ 101.)  There is no allegation that the other two presentations by Immunomedics, which concerned IMMU-132 use for SCLC and NSCLC, were canceled or otherwise affected.

On June 3, 2016, a news article entitled "Immunomedics Kicked Out of Prestigious ASCO Cancer Conference," was published by *TheStreet*.  (*Id.* ¶ 102.)  In it, an ASCO program coordinator was quoted as saying that Immunomedics' breast cancer abstract was removed from the annual meeting because the "confidentiality of th[e] abstract was violated."  (*Id.*)  The article also cited Dr. Bardia, who was described as the principal investigator of the IMMU-132 breast cancer study and scheduled presenter of the abstract at ASCO, as stating that he had not been made aware of the April presentation.  (*Id.*)  The company's share price dropped from June 2 to June 3, a drop the complaint attributes to "[t]his news."  (*Id.* ¶ 103; *see also id.* ¶ 12.)[5]

Immunomedics' TNBC presentation at Best of ASCO later in June 2016 did not materialize, the program having concluded on June 25, 2016 without the presentation having been made.  (*Id.* ¶¶ 13, 107.)  Defendants did not explain "their failure to reverse ASCO's decision" to exclude the TNBC presentation or their "failure to substantiate the claim that the data was different."  (*Id.* ¶ 107.)[6]  Between June 2, 2016 (the day before the company's announcement TNBC abstract presentation had been cancelled) and June 27, 2016 (the first trading day after the Best of ASCO program concluded), Immunomedics' share price dropped approximately 62.3%.  (*Id.* ¶ 108.)  By comparison, between April 19, 2016 (just before the first challenged statement was made) and June 2, 2016, the company's stock price increased from $2.94 to $5.30 per share.  (*Id.* ¶ 6.)

---

[5] The complaint fails to make clear whether the "news" was the abstract's exclusion from the ASCO meeting, the Immunomedics press release about that development, or the criticisms and language used in the cited article.

[6] The complaint alleges that the stock price dropped from June 23 to June 24, 2016, but the relevance of that date is unclear insofar as the paragraph relies on June 25 as the key date.

On June 21, 2016, Immunomedics announced Pfreundschuh's resignation.  (*Id.* ¶ 105.)
Wells Fargo also downgraded its rating of Immunomedics' shares, citing "today's news"
(presumably Pfreundschuh's resignation) and "management missteps."  (*Id.*)  The company's
share price dropped again in response. (*Id.* ¶ 106.)

Tsai alleges that the foregoing statements and omissions were made as part of a
"fraudulent scheme" to attract a licensee for IMMU-132 and increase Immunomedics' stock
price, which, in turn, would allow defendants to profit.  (*See, e.g., id.* ¶ 4.)  As support, Tsai
points to Immunomedics' financial condition, Goldenberg's contracts with the company, and
steps Sullivan and Goldenberg allegedly took to enrich themselves, including stock sales around
the time of ASCO meetings.

With respect to the first item, Immunomedics has operated at a loss since inception, and
"[i]ts only significant sources of revenue in recent years came from a licensing agreement with a
Belgian biotechnology company, UCB, and a collaboration agreement with Bayer."  (*Id.* ¶ 39.)
The UCB agreement was terminated in March 2016, and the company's only sales of products
have been "limited sales of its diagnostic imaging product," for which patent protection has
expired, and it has never sold any therapeutic products.  (*Id.* ¶¶ 39-40.)  Tsai posits that if
Immunomedics cannot develop or license commercially viable therapeutic products, it likely will
never make a significant amount of revenue or be profitable.  (*Id.* ¶ 40.)  To this end, the
company has made clear its desire to enter into a partnership to accomplish its objectives for
IMMU-132.  (*See id.* ¶¶ 63, 69.)  Ultimately, in October 2016, Immunomedics was "forced" to
"go to the market" to raise capital through a stock offering.  (*Id.* ¶ 14.)

The complaint also alleges that Goldenberg and Sullivan, who are, as noted earlier,
husband and wife, stood to profit personally if the company was successful, pointing to

Goldenberg's contracts with the company, alleged insider trading by both defendants, and their income from the company. First, Goldenberg's agreements with the company were drawn in a way that would allow him to benefit financially from the company's financial success, including its product sales, receipt of royalty payments, and "disposition" of certain assets. (*Id.* ¶¶ 42-47; *see also id.* ¶ 28.) Second, Sullivan and Goldenberg sold large quantities of Immunomedics stock in June 2015 and June 2016, right after the ASCO annual meetings each year, after not selling any Immunomedics shares since purchasing them in March 2009. (*Id.* ¶¶ 26, 29, 127.) The complaint asserts that these sales were made at times when the company's stock would have been inflated by the ASCO effect. (*Id.* ¶¶ 48, 127.) Finally, the complaint notes that Goldenberg's and Sullivan's "household income" from Immunomedics since 2000 has totaled "nearly 15% of [the company's] market cap in December 2016." (*Id.* ¶ 31, *see also id.* ¶ 127.)

The complaint also accuses defendants of "persistently emphasiz[ing]" the company's ADC business and IMMU-132 in their press releases, SEC filings, and calls with analysts, and of touting developments relating thereto, including a "breakthrough therapy designation" from the FDA. (*Id.* ¶¶ 55-56.) It paints defendants' earlier efforts to promote IMMU-132 and the company's participation in ASCO conferences as test runs for the 2016 sequence of events. In 2014 and 2015, defendants "repeatedly publicized IMMU-132's potential, making sure to announce whenever ASCO accepted an IMMU-132 abstract for presentation at an ASCO Annual Meeting." (*Id.* ¶ 60; *see also id.* ¶¶ 61-65.) Following disclosures of ASCO participation, Immunomedics' stock price rose. (*Id.* ¶¶ 62, 64, 66.)

To recap, Tsai asserts that defendants' allegedly false statements and material omissions leading up to the 2016 ASCO annual meeting artificially inflated the price of Immunomedics' stock, causing it to trade above its true value and Tsai to purchase it at the artificially high prices.

(*Id.* ¶¶ 119-20.) He further asserts that the statements are actionable because defendants knew that they would not be presenting updated data at ASCO and that their presentations were at risk of being excluded as a result, and yet they made the statements anyway and omitted mention of the risk of exclusion because they had incentives to artificially inflate Immunomedics' value, including making the company attractive to potential licensing partners and, as to Goldenberg and Sullivan, making money. When "partial disclosures" of the "truth" came out on June 3 (defendants' press release), June 21 (Pfreundsuch's resignation and the Wells Fargo rating downgrade), and June 27 (the first trading day after Best of ASCO concluded), the company's stock price declined, and caused Tsai to incur damages. (*Id.* ¶ 120.)

The initial complaint in this action was filed on June 9, 2016, by Jessica Fergus. (D.E. 1.)[7] After Tsai was appointed as lead plaintiff (D.E. 14), he filed the operative complaint, called the "Consolidated Complaint" (D.E. 15) on October 4, 2017. Tsai asserts two claims: (1) violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, which is asserted against all defendants, and (2) violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which is asserted against the individual defendants.

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), arguing primarily that the complaint fails to plead an actionable misstatement or omission under Section 10(b) and Rule 10b-5 and does not adequately plead the existence of scienter, and that it fails to plead a Section 20(a) claim because the predicate Section 10(b) claim fails. (D.E. 25-1 (Moving

---

[7] A complaint asserting nearly identical claims against Immunomedics, Sullivan, and Pfreundschuh was filed before this Court the next day. *Becker v. Immunomedics, Inc.*, Civ. Action No. 16-3374, D.E. 1. It was voluntarily dismissed in November 2016. *Id.*, D.E. 6. Defendants also refer to a shareholder derivative action filed in New Jersey state court in October 2016 and, in their reply, note that it had been dismissed. (Moving Br. 9 n.7; Reply Br. 2 n.1.) No argument is made that either action has preclusionary effect.

Br.); D.E. 28 (Reply Br.).)  In support of their motion, defendants supply copies of, among other things, the challenged press releases and various SEC filings.  (D.E. 25-2 to 25-31, Pendleton Decl.)  Plaintiff disputes that he failed to plead actionable statements or omissions or scienter. He also contends that the individual defendants are primarily liable under Section 10(b) and Rule 10b-5, under Section 20(a) as controlling persons.  (D.E. 27 (Opp. Br.).)

### III.  **Legal Standard**

#### A.  **Standard of Review**

In determining whether a complaint states a cause of action sufficient to survive dismissal under Fed. R. Civ. P. 12(b)(6), the Court must "accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "'[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements'" are all disregarded. *Id.* at 878-79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The plaintiff's right to relief must be more than speculative; it must rise to the level of plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim meets the "plausibility" standard only if the factual allegations permit the Court to "'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

Claims under Section 10(a) and Rule 10b-5 must also meet the requirements of Fed. R. Civ. P. 9(b), which requires fraud allegations to "'state with particularity the circumstances constituting fraud or mistake,'" and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4, which, as discussed in Part III.B, imposes heightened particularity requirements

on the material misrepresentation and scienter elements of these claims. *City of Cambridge Ret. Sys.*, 908 F.3d at 879.

Although a court ruling on a Rule 12(b)(6) motion is generally confined to the pleadings, the court may, without the need to convert the motion to one for summary judgment, consider documents "'integral to or explicitly relied upon in the complaint,'" as well as "'undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted); *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."). The Court may also judicially notice "properly-authenticated public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in a Section 10(b) action, courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

### B. Standard for Review of Exchange Act Claims

Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance" in contravention of SEC rules in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b-5 prohibits, in pertinent part, making an "untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

The private right of action under these provisions "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington*, 114 F.3d at 1417.

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Martin v. GNC Holdings, Inc.*, 2018 U.S. App. LEXIS 34706, at *2, __ Fed. Appx. __ (3d Cir. Dec. 11, 2018) (citing *Tellabs*, 551 U.S. at 322-23); *see also City of Cambridge Ret. Sys.*, 908 F.3d at 879. The PSLRA requires, with regard to the "material misrepresentation" element, that the complaint "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,'" and, as to any allegations made upon information and belief, "'all facts on which that belief is formed.'" *City of Cambridge Ret. Sys.*, 908 F.3d at 879 (quoting 15 U.S.C. § 78u-4(b)(1)). As to scienter, the complaint must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)). To adequately plead this element, the inference of scienter, or "defendant's intention 'to deceive, manipulate, or defraud,'" must be "more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Section 20(a) provides that persons who directly or indirectly control any person liable under the Exchange Act or rules promulgated under it is jointly and severally liable with the controlled person for violations of the act, unless the controlling person "acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action." 15

U.S.C. § 78t(a).  Put succinctly, "[l]iability under Section 20(a) 'is derivative of an underlying

violation of Section 10(b) by the controlled person.'"  *Biondolillo v. Roche Holding AG*, 2018

U.S. Dist. LEXIS 162858, at *18 (D.N.J. Sept. 24, 2018) (Thompson, J.) (quoting *Rahman v. Kid*

*Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013)).  Accordingly, if no Section 10(b) violation has

been adequately pleaded, the Section 20(a) claim also fails.  *Id.*

## IV.  Discussion

### A.  Section 10(b) and Rule 10b-5 Claim

#### 1.  Material Misrepresentations or Omissions

To meet the first requirement of a claim under Section 10(b) and Rule 10b-5, a plaintiff

must demonstrate that the defendant made a material misrepresentation or omission.  *City of*

*Cambridge Ret. Sys.*, 908 F.3d at 879.  This is an objective inquiry to be made from the

perspective of a reasonable investor.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

*Pension Fund*, 135 S. Ct. 1318, 1327 (2015). Tsai contends that statements he challenges were

materially misleading or made material omissions because they represented that defendants

would be presenting at the ASCO meetings and that "updated" results would be presented at

those meetings, but defendants knew they weren't going to present "updated" results and

consequently might not be allowed to present at the meetings.  Defendants argue that their

statements were true when made and were inactionable statements of opinion.[8]

As defendants point out (Moving Br. 14), to be actionable a statement or omission must

have been misleading at the time it was made, and liability cannot be imposed based on

subsequent events. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).  There

---

[8] Defendants also contend that the statements were forward-looking statements subject to the
PSLRA safe harbor. It is unnecessary to resolve that issue because the complaint fails to
plausibly plead that the statements were false or misleading, as discussed *infra*.

is no allegation that ASCO had, by the time of defendants' statements on April 19, May 2, May 4, May 5, and May 19, told them that the TNBC presentation was cancelled. Nor is there any allegation that defendants otherwise knew that the presentation was cancelled at the time the statements were made. To the contrary, the complaint simply alleges that "by" June 3 – *i.e.*, after the statements made on the five dates above – ASCO had cancelled the TNBC presentation. (*Id.* ¶ 99.) Without more, these statements became "untrue" only *after* ASCO decided to exclude the TNBC presentation, and only to the extent they related to that presentation specifically.[9]

Tsai contends, however, that defendants knew when they made those statements that they would, and ultimately did, prematurely disclose data at the Boston presentation that was to be presented at ASCO, which violated the ASCO embargo and that there was consequently a risk that the ASCO presentations would be cancelled. (*See* Compl. ¶¶ 79, 86, 88, 93, 96, 98.) Tsai appears to be arguing that because defendants did not include in their statements about the ASCO presentations that there was a risk, known to them, that the presentations would not happen, the statements were misleading. *See NAHC*, 306 F.3d at 1330 (defendants "not obligated to predict future events unless there is reason to believe that they will occur"). Although it is correct that a literally accurate statement can still be actionable if it creates a "false impression contrary to the truth" (Opp. Br. 15), that assessment is made on the basis of reviewing the statements in their proper context. *See In re Amarin Corp. PLC Secs. Litig.*, 2016 U.S. Dist. LEXIS 55568, at *28 (D.N.J. Apr. 26, 2016) (Wolfson, J.) (courts must examine statements in

---

[9] Despite making the sweeping allegation that defendants were "ejected" or "kicked out" from the ASCO meeting (Compl. ¶¶ 100, 102), Tsai does not dispute that defendants' IMMU-132 presentations on SCLC and NSCLC proceeded as scheduled. (*Id.* ¶¶ 11, 12, 99; Pendleton Decl. Ex. 9 (June 6, 2016 press release, consideration of which Tsai does not oppose, Opp. Br. 12 n.3, stating that NSCLC presentation was made).) Insofar as the challenged statements relate to those two presentations, then, there is, and can be, no argument that, when made, they were false or misleading or made material omissions concerning defendants' then-anticipated presentations on NSCLC and SCLC.

context to "determine whether they were indeed misleading"), *aff'd*, 689 F. App'x 124 (3d Cir.

2017).  And neither Section 10(b) nor Rule 10b-5 imposes an affirmative duty to "'disclose any

and all material information'"; to the contrary, disclosure is required only when it is necessary to

make the statements made, under the circumstances in which they were made, not misleading.

*City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014) (quoting *Matrixx

Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011)).

Here, with the benefit of context, it cannot be plausibly inferred that the April 19, May 2,

May 4, May 5, or May 19 statements were misleading or suffered from an actionable omission.

First, the complaint alleges no facts demonstrating that the statements were ever false, even after

the Boston presentation.  It simply proclaims that the specific data presented was the same or

"substantially" the same as what Immunomedics was to present at the ASCO meetings (Compl.

¶¶ 8, 10, 98), and, as support, offers only the fact of the June 3 TBNC presentation's cancellation

and an assertion that the Best of ASCO presentation of the TNBC abstract did not proceed.

Those cancellations permit only a weak inference that the data were the same, because, as noted

*supra*, it is undisputed that the other two ASCO presentations on SCLC and NSCLC did proceed

as scheduled.  The conclusion Tsai seeks to draw is especially implausible given his allegation

that defendants knew about the ASCO embargo and the risk that ASCO would cancel

presentations that violated it. Assuming the truth of this allegation, defendants' multiple

disclosures of the Boston presentation in April and May 2016, which are discussed below, only

make sense if the data were *not* the same as what they intended to present at ASCO.

But even if the data in the Boston presentation were exactly the same as the data

defendants expected to present at the ASCO meetings, it is not plausible to conclude that the

challenged statements were misleading for failure to disclose that information.  The complaint

allegations and documents properly considered on this motion to dismiss make clear that
defendants did contemporaneously disclose the fact and at least some content of the PEGS
Boston presentation – the very circumstances that Tsai claims would violate the ASCO embargo
and put defendants' ASCO presentations at risk – and did so repeatedly, sometimes at the same
time they made statements about the expected ASCO presentations.  A little over a week after
the April 19 press release, Immunomedics issued the April 29 press release (which Tsai also
challenges) discussing treatment responses concerning IMMU-132, and stating that Goldenberg
had been invited to PEGS Boston 2016 "to present the updated, interim Phase 2 results" at the
conference, "which is taking place at The Seaport World Trade Center in Boston, MA."
(Pendleton Decl., Ex. 3; Compl. ¶ 80 (discussing press release).)  The press release went on to
summarize the treatment responses achieved for TBNC, NSCLC, and SCLC – the three
indications as to which the company's IMMU-132 presentations at ASCO were to be made – as
well as for urothelial cancer.  (Pendleton Decl., Ex. 3.)

To the extent Tsai argues that defendants' April and May 2016 statements about the
ASCO presentations and the updated data they expected to present were misleading because they
did not specifically say that the April 29 presentation jeopardized the ASCO presentations, the
April 29 press release itself disclosed the information a reasonable investor would need to reach
that conclusion. Tsai contends that the April 29 press release itself was problematic, and
presumably did not serve this informational function, because it did not state that the data therein
were "the same as the information and results to be presented at ASCO."  (Compl.  ¶ 80.)  But,
again, the complaint's bald assertions are insufficient to permit the inference that the information
*was* in fact the same.

Additionally, the May 4 press release does not only state that "[k]ey updates in [TNBC], as well as non-small-call and small-cell lung cancers will be provided at ASCO next month" and that "[u]pdated Phase 2 results in patients with metastatic [TNBC] will be presented in a Clinical Science Symposium Session at the 2016 [ASCO] Annual Meeting on Friday, June 3, 2016." (Pendleton Decl., Ex. 5.) It also says, immediately before the latter statement, that "[d]urable objective responses with sacituzumab govitecan in a number of patients with advanced, metastatic solid cancers, after failing multiple prior therapies, some including checkpoint inhibitors, *were reported at PEGS Boston 2016*." (*Id.* (emphasis added).) *See City of Edinburgh Council*, 754 F.3d at 169 (statements are to be examined in full context of the documents in which they are found (citing *Burlington*, 114 F.3d at 1426)). Similarly, another contemporaneous document, this one a judicially-noticeable SEC filing (a different part of which is excerpted in the complaint (¶ 56)), further undermines Tsai's argument. Immunomedics filed a Form 10-Q with the SEC on May 4, 2016, in which it stated that "Results in TNBC, NSCLC, and SCLC were updated by Dr. David M. Goldenberg who was invited to present at PEGS Boston 2016 in April." (Pendleton Decl., Ex. 6, at 645.)[10] The filing then proceeded to summarize the data presented in Boston, mirroring the content of the April 29 press release. (*Id.* at 647). The complaint itself also alleges several other disclosures of the Boston presentation prior to the ASCO cancellation: defendants' publication of the presentation on the Immunomedics website and their discussion of the data with securities analysts on the May 5 call. (Compl. ¶¶ 10, 98.)

All of these documents (which the Court may properly consider in deciding defendants' motion to dismiss), coupled with plaintiff's own allegations, undermine plaintiff's argument that

---

[10] Due to the inconsistent pagination in this document, page references are to the Page ID numbers generated by the electronic filing system.

the statements made on April 19, April 29, May 2, May 4, May 5, and May 19 were actionably false or misleading or made material omissions. Tsai's argument appears to be that defendants should have specifically said, every time they touted their ASCO meeting participation, that the company might *not* make those presentations because defendants had violated the rules for participation. But, in view of the complaint's other allegations and the contemporaneous disclosures that defendants made, this argument is unpersuasive.

Similarly, the statement Tsai challenges in the June 3, 2016 press release is not actionable. In that press release, which announces ASCO's cancellation of defendants' TNBC presentation, Sullivan states that they were attempting to reverse the decision, and that "*we believe* the patient population and results reported in April were different from those in the ASCO abstract submitted last February." (Compl. ¶¶ 100; Pendleton Decl., Ex. 8.) Statements of opinion are generally not actionable, unless they qualify for an exception. *City of Edinburgh Council*, 754 F.3d at 170 ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis."); *see also Omnicare*, 135 S. Ct. at 1328-29. In opposing the motion to dismiss, Tsai does not make an argument specific to this June 3 statement in asserting that the statements, in general, are either not opinions or, if they are opinions, are nonetheless actionable. Instead, he contends generically that the complaint "sufficiently alleges the third *Omnicare* exception": that an opinion statement is actionable if it omits material facts about the speaker's inquiry into knowledge concerning the statement and those facts conflict with what a reasonable investor would take from the statement itself. (Opp. Br. 17-18 (citing *Omnicare*, 135 S. Ct. at 1326-29). Once again, the complaint simply asserts, without any factual allegations other than the cancellation itself, that the data in the April presentation were identical to the data to be presented at the June ASCO TNBC presentation.

Moreover, as with the earlier statements, the development that that defendants did not end up presenting the TNBC abstract at Best of ASCO in late June 2016 does not render the belief expressed in the June 3 press release retroactively false or misleading. *See Amarin*, 2016 U.S. Dist. LEXIS 55568, at *60 (fact that speaker was "ultimately wrong in his beliefs is not a basis, by itself, to bring a claim under Section 10(b)"). And the complaint alleges no facts regarding the reasons or circumstances for defendants' failure to present at Best of ASCO from which the Court could infer that the June 3 statement represents an actionable misrepresentation or omission.

In view of the content of the challenged statements and the circumstances in which they were made, the statements plaintiff challenges are not actionable misrepresentations or omissions.[11] Accordingly, plaintiff's claim pursuant to Section 10(b) and Rule 10b-5 must be dismissed.

### 2. Scienter

Even plaintiff had adequately pleaded the first element of a claim under Section 10(b) or Rule 10b-5, Tsai's claims still fail, because the complaint fails to plausibly plead scienter. To adequately plead scienter, the complaint must state, with particularity, facts giving rise to a "strong inference" that the defendant had the requisite state of mind, meaning an intent to

---

[11] This conclusion, and, as discussed *infra*, the complaint's failure to adequately plead scienter, render it unnecessary to reach the question of whether the complaint adequately pleads materiality, an issue both parties address somewhat obliquely in making their arguments on whether the statements are actionable misrepresentations or omissions and which is often inappropriate for disposition at this stage. *See In re Toronto-Dominion Bank Secs. Litig.*, 2018 U.S. Dist. LEXIS 206043, at *31 (D.N.J. Dec. 6, 2018) (Hillman, J.) (observing that materiality is generally an issue for the factfinder unless "'the disclosure or omissions are so clearly unimportant that reasonable minds could not differ'" (quoting *In re Galena Biopharma, Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 141550, at *26 (D.N.J. Aug. 21, 2018)); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Similarly, the Court need not reach whether loss causation has been adequately pleaded.

deceive, manipulate, or defraud. *City of Cambridge Ret. Sys.*, 908 F.3d at 879. The Third Circuit has also stated that the facts asserted must give rise to a strong inference of "reckless or conscious behavior." *Martin*, 2018 U.S. App. LEXIS 34706, at *3 (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)). A "reckless" statement goes beyond negligence, and represents "'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the action must have been aware of it.'" *Id.* (quoting *Avaya*, 564 F.3d at 267 n.42).

A "strong" inference of scienter is one that is "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. It must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* The inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

The complaint falls short of this standard. In addition to inferences favoring plaintiff, the Court must consider "'plausible, non-culpable explanations for the defendant's conduct.'" *Martin*, 2018 U.S. App. LEXIS 24706, at *4 (quoting *Tellabs*, 551 U.S. at 324). Against the inference Tsai wishes to draw – that defendants knew about ASCO's embargo policy and therefore intended to defraud investors into purchasing artificially inflated company stock or a licensing partner into a deal by falsely or deceptively touting their anticipated participation in the ASCO meetings – is the factual assertion, which appears multiple times in the complaint itself, that defendants *disclosed* the Boston presentation. If defendants believed that the content of the Boston presentation would disqualify them from presenting at the ASCO meetings -- that is, if they made their statements about ASCO participation and their expectation of providing updated

results at that conference with an "intent to deceive, manipulate, or defraud" investors into believing the presentations would happen when they wouldn't -- their repeated disclosures of the Boston presentation and at least some of its content would totally undermine that alleged scheme. Those disclosures, all publicly made in press releases, SEC filings, and on a call with analysts, made public the very information that defendants would be expected to hide if they truly had an intent to deceive potential licensing partners and the market into purchasing company shares at an inflated value. Indeed, if defendants truly believed that their presentation at the Boston conference would jeopardize the company's participation in the prestigious ASCO meetings, it is hard to imagine why they would have participated in the Boston event, much less make multiple public disclosures about that participation, and the complaint allegations provide no answers in that respect.

Moreover, it is entirely plausible that defendants touted their anticipated participation in the ASCO conferences not to falsely inflate the company's value, but to legitimately take advantage of its abstracts' acceptance and tout its participation in a conference that plaintiff himself says had been known to benefit companies' stock prices. (*See* Compl. ¶ 59.) This is particularly so for a company that plaintiff admits has been searching for a licensing partner and which should therefore be expected to make itself look as attractive as possible; the complaint supplies no facts suggesting why the company or its executives would have a motive to do so through deceptive statements rather than true ones. Considered alongside defendants' public disclosures of the Boston presentation, the inference that defendants made the statements about their ASCO participation for legitimate business reasons, and not with the intent to defraud the market and investors like plaintiff, is far more likely than the one plaintiff wishes to draw.

Adding to the mix the stock sales by two of the four defendants, Sullivan and Goldenberg, and Goldenberg's contracts with the company, both of which Tsai argues are probative of ill intent, does not tip the inference of scienter into a "draw." (Opp. Br. 23.) Stock sales by officers that are "'unusual in scope or timing'" may well support an inference of scienter. *Oran*, 226 F.3d at 290 (citation omitted). But mere sales of stock by an insider do not compel an inference of scienter. *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 119 (3d Cir. 2018). Other factors matter, including whether the transactions were unusual in scope or timing, the amount of profit made and stock traded, how much of the insider's holdings were sold, how many insiders participated, and whether the profits were "substantial" in relation to the insider's typical compensation. *Id.* (citations omitted). Here, the complaint alleges that the 2016 stock sales were made between June 6 and June 13, *after* Immunomedics' TNBC abstract was pulled from ASCO's annual meeting and *after* that cancellation was made public by both Immunomedics itself and in the media. (*See id.* ¶¶ 100, 102, 104.) Tsai argues that the company's failure to present its TNBC abstract at Best of ASCO in late June is another key milestone, and that the stock sales preceded that development, but fails to explain why, if Sullivan and Goldenberg had known all along that their participation in ASCO's meeting was in jeopardy, they would wait until after that risk came to fruition to sell their stock – at prices well below their trading high on June 2. *See Hertz*, 905 F.3d at 120 (declining to draw inference of scienter based on unsuspicious nature of timing, when defendants sold shares when stock was trading below its class period high).

Tsai also contends that the 2015 and 2016 sales were historically unusual for these defendants, which cuts in favor of a scienter inference. But the complaint makes no allegations about the financial impact of the stock sale on Goldenberg's or Sullivan's holdings or the

relation of that amount to their overall compensation, and in the circumstances in which these sales were made, Tsai's proposed inference is not as compelling as the opposing inference.

"Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation is a 'relevant consideration' that 'may weigh heavily in favor of a scienter inference.'" *Hertz*, 905 F.3d at 119 (quoting *Tellabs*, 551 U.S. at 325). But motives "'generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.'" *Rahman*, 736 F.3d at 245-46 (quoting *Avaya*, 564 F.3d at 278). *See also Avaya*, 564 F.3d at 279 ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud."). As to Pfreundschuh, the complaint is devoid of any such alleged motive. As to Sullivan, the only special motive ascribed to her appears to be her stock holdings (which are unpersuasive, as discussed above) and marriage to Goldenberg, who had employment contracts and other contracts with the company under which he would benefit from the company's success. But not only do those arrangements appear unremarkable, it is unclear how the alleged *fraud* would specifically benefit him, the company, or any other defendant.

### B. Section 20(a) Claim

Because no Section 10(a) claim has been adequately pleaded, Tsai's controlling persons claim against the individual defendants under Section 20(a), which, as noted is a derivative claim, *Biondolillo,* 2018 U.S. Dist. LEXIS 162858, at *18-19, is likewise dismissed. *See also City of Edinburgh Council*, 754 F.3d at 177 ("Because the Funds have failed to adequately plead a predicate section 10(b) claim, their section 20(a) claim must be dismissed.").

## V.    <u>Conclusion</u>

Having carefully considered the allegations of the consolidated complaint and the parties' arguments, the Court concludes that the complaint fails to adequately plead claims for relief.  For the reasons set forth above, defendants' motion to dismiss will be granted, and the consolidated complaint will be dismissed without prejudice.  Plaintiff may file an amended complaint within 30 days.  An appropriate order will issue.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: March 31, 2019