~~Bruce D. Greenberg~~
**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for the Class*
~~Reed R.~~ Kathrein ~~*(Pro Hac Vice* applied for)~~
~~Peter E. Borkon *(Pro Hac Vice)*~~
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (admitted *Pro Hac Vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
~~Email:~~ reed~~@hbsslaw.com~~
~~peterb~~@hbsslaw.com

*Lead Counsel for the Class*

*[Additional Counsel Appear on Signature Page]*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JESSICA FERGUS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IMMUNOMEDICS, INC., CYNTHIA L. SULLIVAN, PETER P. PFREUNDSCHUH and DAVID GOLDENBERG,<br><br>Defendants. | Civil Action No. 2:16-cv-03335-KSH-CLW<br><br>**SECOND AMENDED CONSOLIDATED COMPLAINT** |

# Table of Contents


~~I. INTRODUCTION~~ ..... 1

~~II. NATURE OF ACTION~~ ..... 2

~~III. JURISDICTION AND VENUE~~ ..... 9

~~IV. PARTIES~~ ..... 10

~~V. FACTUAL BACKGROUND~~ ..... 15

~~A. Immunomedics's Founding and History of Financial Losses~~ ..... 15

~~B. Goldenberg and His Wife Sullivan Stood to Gain Substantial Monetary Compensation~~ ..... 16

~~1. As the Inventor and Patentee of IMMU-132 Defendant Goldenberg and His Wife, Defendant Sullivan, Stood to Personally Gain From Commercialization of IMMU-132 Through Royalties~~ ..... 16

~~2. Goldenberg Stood to Gain Substantial Compensation If He Could Find Investors Willing to Partner or License IMMU-132~~ ..... 17

~~3. Goldenberg and Sullivan Stood to Gain By Any Run-Up of IMMU Stock Price Prior to Their Sale of Stock And They Exploited The ASCO Effect to Sell At Inflated Prices~~ ..... 18

~~C. Immunomedics's Campaign to Hype IMMU-132, Its Flagship Product~~ ..... 19

~~D. The ASCO Effect Inflates Biotech Stock Prices Of Companies That Present at the Annual Conference~~ ..... 20

~~E. Defendants Exploited the ASCO Effect to Raise the Company's Profile and Attract a Licensing Partner~~ ..... 22

~~F. Pre-Class Period Defendants Reach Agreement with FDA on Phase 3 Design and IMMU-132 Receives Breakthrough Therapy Designation~~ ..... 27

~~G. Defendants Submitted Abstracts for 2016 and Agreed to Abide by ASCO's Confidentiality Policy~~ ..... 29

~~VI. DEFENDANTS MADE FALSE AND/OR MISLEADING STATEMENTS ABOUT THEIR SUBMISSIONS TO ASCO AND PROMISED NEW DATA DURING THE CLASS PERIOD~~ ..... 33

~~VII. THE TRUTH EMERGES~~ ..... 45

~~VIII. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS~~ ....52

~~IX. LOSS CAUSATION~~ ....55

~~X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE~~ ....58

~~XI. ADDITIONAL SCIENTER ALLEGATIONS~~ ....59

~~XII. NO SAFE HARBOR~~ ....61

~~XIII. CAUSES OF ACTION~~ ....61

~~Count I (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)~~ ....61

~~Count II (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)~~ ....64

~~XIV. PRAYER FOR RELIEF~~ ....66

~~XV. JURY DEMAND~~ ....67

I. INTRODUCTION ....1

II. NATURE OF ACTION ....2

III. JURISDICTION AND VENUE ....9

IV. PARTIES ....10

V. FACTUAL BACKGROUND ....15

A. Immunomedics's Founding and History of Financial Losses ....15

B. Goldenberg and His Wife Sullivan Stood to Gain Substantial Monetary Compensation ....16

1. As the Inventor and Patentee of IMMU-132 Defendant Goldenberg and His Wife, Defendant Sullivan, Stood to Personally Gain From Commercialization of IMMU-132 Through Royalties ....16

2. Goldenberg Stood to Gain Substantial Compensation if He Could Find Investors Willing to Partner or License IMMU-132 ....17

3. Goldenberg and Sullivan Stood to Gain By Any Run-Up of IMMU Stock Price Prior to Their Sale of Stock And They Exploited The ASCO Effect to Sell At Inflated Prices ....18

C. Immunomedics's Campaign to Hype IMMU-132, Its Flagship Product ..............19

D. The ASCO Effect Inflates Biotech Stock Prices of Companies That Present at the Annual Conference ..............20

E. Defendants Exploited the ASCO Effect to Raise the Company's Profile and Attract a Licensing Partner ..............22

F. Pre-Class Period Defendants Reach Agreement with FDA on Phase 3 Design and IMMU-132 Receives Breakthrough Therapy Designation ..............27

G. Defendants Submitted Abstracts for 2016 and Agreed to Abide by ASCO's Confidentiality Policy ..............29

H. Defendants Announce "Updated TNBC Results" to Be Presented At ASCO ..............33

I. On April 29, 2016, Defendants Publish the TNBC IMMU-132 data at the Boston PEGS Conference (in violation of the well-known ASCO embargo) without telling investors that it is the same data they will present at ASCO ..............34

VI. DEFENDANTS FALSELY PROMISE NEW PREVIOUSLY UNDISCLOSED UPDATED TNBC RESULTS TO BE PRESENTED AT ASCO ON JUNE 3RD AND 24TH ..............36

VII. THE TRUTH BEGINS TO EMERGE ..............45

VIII. THE TRUTH FULLY EMERGES – THERE WERE NO NEW "UPDATED RESULTS" ..............49

IX. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ..............52

X. LOSS CAUSATION ..............55

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ..............58

XII. ADDITIONAL SCIENTER ALLEGATIONS ..............59

XIII. NO SAFE HARBOR ..............61

XIV. CAUSES OF ACTION ..............61

Count I (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder) ..............61

Count II (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants) ..............64

XV. PRAYER FOR RELIEF ..............66

XVI. JURY DEMAND ..... 67

Lead Plaintiff, Sensung Tsai, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, filings made with the United States Securities and Exchange Commission ("SEC"), conference calls and announcements issued by Immunomedics, Inc. ("Immunomedics" or the "Company"), wire and press releases published by and regarding the Company, conference call transcripts, and other information readily obtainable in the public domain.

## I. INTRODUCTION

1. This is a securities class action on behalf of all investors who purchased or otherwise acquired Immunomedics securities (the "Class") between ~~April 20~~May 2, 2016 and June 24, 2016 inclusive (the "Class Period") and asserts claims against Immunomedics and certain of Immunomedics's executive officers and directors for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Throughout the Class Period, Defendants made a series of false and/or misleading statements, and/or omitted to state material facts necessary to make the statements not misleading to attract a much-needed licensee and to increase the price of Immunomedics shares, allowing Defendants to profit.

## II. NATURE OF ACTION

2. Immunomedics is a biopharmaceutical company with a stated mission of being dedicated to novel immunotherapeutics for the treatment of cancer, autoimmune and other serious diseases.[1]

3. ~~During the Class Period,~~ Immunomedics's core operation was its Antibody-Drug Conjugate ("ADC") business and its lead product candidate within that core operation was sacituzumab govitecan ("IMMU-132"). The holder of the IMMU-132 patent was the Company's Founder, Chairman, and Chief Scientific Officer ("CSO") Defendant David Goldenberg. His wife, Defendant Cynthia L. Sullivan was Chief Executive Officer ("CEO") and President.

~~4. Unable to commercialize IMMU-132 without the financial deep pockets of a licensee, Defendants devised a fraudulent scheme to attract such a licensee, as well as increase the price of IMMU stock, in order to allow Defendants to profit, by making a series of misleading statements, and omitting to state material facts necessary to make the statements not misleading ahead of the June 2016 Annual Meeting of the American Society of Clinical Oncology ("ASCO").~~

4. Beginning on May 2, 2016, Defendants falsely claimed that Immunomedics would present previously undisclosed "updated results" from its Phase 2 study of patients with metastatic triple negative breast cancer ("TNBC") at the prestigious Clinical Science Symposium Session of the June 2016 Annual Meeting of the American Society of Clinical Oncology ("ASCO") and the "Best of ASCO Program" scheduled to occur two weeks after the Annual

---

[1] Immunomedics, ~~http~~https://www.immunomedics.com/~~index-static.shtml~~our-company/ (last visited ~~Sep.~~May 28, ~~2017~~2019).

Conference, on June 24 and 25, 2016 in Chicago. The expectation of the upcoming previously undisclosed "new results" drove up the price of Immunomedics stock, and Defendants were able to time the sales of stock to take advantage of the higher stock price before it became clear that there were no previously undisclosed new results. All results had previously been presented weeks earlier at a conference in Boston.

5. ASCO's Annual Meetings are one of the largest and most prominent cancer conferences in the world, bringing together more than 30,000 oncology professionals from around the globe. Defendants knew that share prices for biotech and pharmaceutical companies routinely jump on announcements that *new previously undisclosed research results will be presented* at the ASCO Annual Meeting and that those shares continue to trade at elevated prices from the announcement until well after the ASCO presentation. This phenomenon is so prevalent that it is called the "ASCO Effect" by the industry, analysts, and media following the industry.

~~6. During the Class Period, Defendants' scheme exploited the ASCO Effect. More specifically, in the weeks before the ASCO annual conference, Defendants boasted that their upcoming abstract presentation on the treatment of triple negative breast cancer (TNBC) with sacituzumab govitecan (IMMU-132) had been accepted for the annual conference, and they promised that they would supply new updated data or research results about IMMU-132 and TNBC at that conference in June 3, 2016. They boasted that two other IMMU-132 abstract had been selected at two smaller Clinical Science Symposium Sessions also during the annual ASCO meeting. A June 4, 2016 "poster session" would present data on IMMU-132 and small-cell lung cancer (SCLS) and another abstract on non-small-cell lung cancer (NSCLC) would be presented on June 6, 2016. Defendants also boasted that they had also been selected to present their~~

~~TNBC/IMMU-132 results at the Best of ASCO conference in Chicago on July 24th. These announcements, and the expectation of new data and information drove the Company's stock price approximately 80% higher over the Class Period from a closing price of $2.94 per share on April 19, 2016, to close at $5.30 on June 2, 2016, and hitting its two-year high of $5.44 that same day.~~

~~7.~~6. A critical component contributing to the anticipation of the abstract presentations at ASCO is the ASCO embargo (and corresponding confidentiality) agreement, which ensures that conference attendees – and the industry at large – are getting never-before-seen data and information at the conference. By signing the embargo agreement, Defendants agreed and represented that their abstracts contained this never-before-seen data, and that they would keep the information, content, and conclusions confidential.

~~8.~~7. But in Defendants' case, this was not true. Defendants presented the same data a few months earlier, in an April 2016 conference in Boston. Because of this previous presentation, the data to be presented at ASCO and Best of ASCO would be old data – rather than the new unveiling of data that ASCO, conference attendees, and investors were expecting.

~~9.~~8. Defendants were aware that submitting an abstract to ASCO constitutes an agreement that the abstract and its contents were final and, most importantly, that Defendants were obligated to keep their data confidential until after the presentations at the June 2016 ASCO meetings. More specifically, submission of an abstract to ASCO meant that the author, coauthors, sponsor of the research, journalists and others may not (a) make the information public, or provide it to others who may make it public, (b) publish or present the information or provide it to others who may publish or present it, or (c) use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes.

~~10.~~9. However, Defendants concealed from investors that the information to be presented at ASCO was not materially new or different data, information, content or conclusions~~.~~ ~~Defendants knew and failed to inform investors~~ from that ~~they would and had breached their embargo agreement with ASCO. That agreement required Defendants to keep the abstract data confidential until after Defendants~~ presented ~~their abstracts at ASCO's June 2016 meeting. Defendants breached their agreement while trying to attract the attention of a desperately needed potential partner or licensee by presenting~~weeks earlier. Rather, the IMMU-132 TNBC data was presented at ~~an industry networking~~a conference held in Boston in April 2016, ~~posting~~ a summary presentation was posted on the Company's website, and~~/or discussing~~ Defendants had already discussed the data with securities analysts. Defendants knew no new data would be forthcoming.

~~11. Once~~When ASCO discovered ~~Defendants' attempt to present old data or materially the same data,~~ that the information~~, content or conclusions at ASCO's June 2016 meeting – and corresponding breach of the embargo agreement – ASCO notified~~ in the TNBC abstract, Defendants ~~that it canceled at least one IMMU-132~~had submitted to ASCO for presentation~~.~~

10. ~~Finally, with their breach of~~ at the June 3rd and 24th ASCO ~~contract exposed and their~~ conferences, had been previously been made public and presented at a prior conference – and therefore contained no materially new updated results – ASCO canceled the presentation ~~at the ASCO conference having been forcibly withdrawn~~and retracted publication of the abstract in conjunction with the conferences.

~~12.~~11. One the day of the presentation, Defendants finally admitted via press release on June 3, 2016, that ~~at least the most important of their presentations were~~the presentation had

been cancelled but contended that ASCO was wrong. This news drove down the price of Immunomedics shares by $0.78 from a closing price of $5.30 on June 2, 2016 to close at $4.52 on June 3, 2016 – a loss of about 14.7% – and the share price continued to fall during the next several trading days. Defendant Peter P. Pfreundschuh, the CFO, resigned within days of the cancellation, and Defendants contention that there was new data to be presented.

~~13.~~12. Still investors held out hope. Defendants stated in their June 3rd press release that the data, information, content or conclusions was indeed new, and that they were "attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February." By June 24-25, 2016, when Defendants were scheduled to present to the Best of ASCO, there was still no word from Defendants and no presentation was made. By then, with no prospects of new data, the Company's share price dropped another $2.35 from a closing price of $4.52 on June 3, 2016 to close at $2.17 on June 24, 2016 – a loss of about 52% – but not before Defendants, Chairman Goldenberg and his future wife, CEO Sullivan, had dumped $4.9 million worth of stock at prices between $3.02 and $4.095 per share. By June 27th, Immunomedics stock had dropped to $3.00 from its closing price of $5.30 on June 2, 2016 to close at $2.00 on June 27, 2016 – a loss of about 62.3%.

~~14.~~13. Without a licensee in hand, Defendants were forced by October 2016 to go to the market to raise the much-needed capital. For receipt of $30 million, Immunomedics offered an additional 10 million shares of common stock and accompanying warrants to purchase Immunomedics stock for $3.00 per share. The warrants were recorded $7.5 million upon issuance and had an exercise price of $3.75 million.

~~15.~~14. As a result of Defendants' conduct, Plaintiff and other members of the Class purchased Immunomedics securities at artificially inflated prices and thereby suffered significant losses and damages.

~~16.~~15. ~~On January 1,~~By May 2017, Defendant Goldenberg (Chairman and CSO) was forced out all of his ~~role, and~~ positions in the Company as was his wife, Defendant Sullivan ~~was forced out as~~ , who had been CEO and President.

~~17.~~16. The chart set forth below shows Immunomedics stock performance a year and a half before the Class Period, and demonstrates (in red arrows) the impeccably timed insider sales immediately after their scheduled presentations at ASCO conferences:






~~18.~~17. The chart below shows the inflation of Immunomedics stock during the Class Period, resulting from Defendants' statements beginning on April 2016, ~~and~~ the plummet upon disclosure of the truth on June 3, 2016, and news of Defendants insider selling transactions which occurred on June 7-13, 2017, before the investors learned that no "new data" would be forthcoming on June 24th:







## III. JURISDICTION AND VENUE

~~19.~~18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act.

~~20.~~19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

~~21.~~20. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as Immunomedics has its corporate headquarters located in this District and conducts substantial business therein.

~~22.~~21. In connection with the acts, omissions, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV. PARTIES

~~23.~~22. Lead Plaintiff, Sensung Tsai, as set forth in the accompanying certification incorporated by reference herein, purchased Immunomedics securities during the Class Period and has suffered a loss caused by Defendants' conduct.

~~24.~~23. Defendant Immunomedics is a Delaware corporation with its headquarters located at 300 The American Road, Morris Plains, New Jersey, 07950. The Company's stock trades on the Nasdaq stock exchange under the ticker symbol IMMU. IMMU common stock began trading on the Nasdaq on March 26, 1990. IBC Pharmaceuticals, Inc. ("IBC") is a majority-owned subsidiary of Immunomedics. IBC is engaged in the research and development of novel cancer radioimmunotherapeutics using patented pretargeting technologies with proprietary, bispecific antibodies.

~~25.~~24. Defendant Cynthia L. Sullivan ("Sullivan") was a director of the Company at all relevant times during the Class Period and served as the Company's President and ~~Chief Executive Officer~~CEO until her resignation announced on May 3, 2017. During the Class Period, Sullivan was also employed by IBC. Sullivan is married to Defendant Goldenberg and uses her married name, Goldenberg, in some SEC filings and disclosure documents.

~~26.~~25. In June of 2015 and June of 2016, immediately after the scheduled ~~IMMU~~Immunomedics presentation at the ASCO conference, Defendant Sullivan sold 1.2 million shares of ~~Immunomedics~~IMMU for proceeds of nearly $5 million. Prior to these sales, Defendant Sullivan had not sold any IMMU shares since she purchased them in March 4, 2009. Sullivan reported those sales (which include sales by her spouse, Defendant Goldenberg) on SEC Form 4 as follows:

| Transaction Date | Reported Date | Symbol | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|---|
| 6/13/2016 | 6/14/2016 | IMMU | 128,674 | $3.0247 | $389,200.25 |
| 6/13/2016 | 6/14/2016 | IMMU | 139,950 | $3.0198 | $422,621.01 |
| 6/10/2016 | 6/14/2016 | IMMU | 11,326 | $3.0709 | $34,781.01 |
| 6/10/2016 | 6/14/2016 | IMMU | 92,040 | $3.0547 | $281,154.59 |
| 6/8/2016 | 6/8/2016 | IMMU | 41,441 | $3.6249 | $150,219.48 |
| 6/8/2016 | 6/8/2016 | IMMU | 120,388 | $3.6447 | $438,778.14 |
| 6/7/2016 | 6/8/2016 | IMMU | 4,600 | $4.0059 | $18,427.14 |
| 6/7/2016 | 6/8/2016 | IMMU | 12,300 | $3.98 | $48,954 |
| 6/6/2016 | 6/8/2016 | IMMU | 63,959 | $4.0945 | $261,880.13 |
| 6/6/2016 | 6/8/2016 | IMMU | 110,322 | $4.0881 | $451,007.37 |
| 6/15/2015 | 6/16/2015 | IMMU | 210,991 | $4.08 | $860,569 |
| 6/10/2015 | 6/12/2015 | IMMU | 359,653 | $4.32 | $1,554,441 |

~~27.~~26. Defendant Peter P. Pfreundschuh ("Pfreundschuh") was the Company's Chief Financial Officer ("CFO") at all relevant times during the Class Period and has served in that role since September 2013. On June 21, 2016, the Company announced that Pfreundschuh submitted his resignation on June 16, 2016. He continued to serve as a consultant to Immunomedics from June 2016 to August 2016. Pfreundschuh signed the Company's May 4, 2016 Form 10-Q filing and made false representations to investors in conference calls, press releases and public statements during the Class Period.

~~28.~~27. Defendant David Goldenberg ("Goldenberg") is the Company's founder and served as Chairman of the Board, Chief Medical Officer~~,~~ ("CMO"), Chief Scientific Officer ("CSO") and Chief Patent Officer ("CPO") at all relevant times during the Class Period until his

resignation announcement on May 3, 2017. During the Class Period, Goldenberg was also employed by IBC and the David M. Goldenberg Millennium Trust owned 18.32% of IBC. In his capacity as Immunomedics's Chief Scientific Officer and Chief Patent Officer and Chairman of IBC, Goldenberg directed the research and development activities for both Immunomedics and IBC. As a result, the development of new intellectual property was allocated to either Immunomedics or IBC and, in some cases, was the joint property of Immunomedics and IBC. Goldenberg is largely responsible for allocating ownership between IBC and Immunomedics. Goldenberg is married to Sullivan. As such, Goldenberg and Sullivan stood to personally and directly benefit from the success of IMMU-132.

29.28. In June of 2015 and June of 2016 immediately after scheduled IMMUImmunomedics presentation at the ASCO conference, Defendant Goldenberg sold 1.295 million shares of ImmunomedicsIMMU for proceeds of nearly $5 million. Prior to these sales, Defendant Goldenberg had not sold any IMMU shares since he purchased them in March 4, 2009. Goldenberg reported those sales (which include sales by his spouse Defendant Sullivan) on SEC Form 4 as follows:

| Transaction Date | Reported Date | Symbol | Shares Sold | Average Price | Total Proceeds |
|---|---|---|---|---|---|
| 6/13/2016 | 6/14/2016 | IMMU | 128,674 | $3.0247 | $389,200.25 |
| 6/13/2016 | 6/14/2016 | IMMU | 139,950 | $3.0198 | $422,621.01 |
| 6/10/2016 | 6/14/2016 | IMMU | 11,326 | $3.0709 | $34,781.01 |
| 6/10/2016 | 6/14/2016 | IMMU | 92,040 | $3.0547 | $281,154.59 |
| 6/8/2016 | 6/8/2016 | IMMU | 41,441 | $3.6249 | $150,219.48 |
| 6/8/2016 | 6/8/2016 | IMMU | 120,388 | $3.6447 | $438,778.14 |
| 6/7/2016 | 6/8/2016 | IMMU | 4,600 | $4.0059 | $18,427.14 |
| 6/7/2016 | 6/8/2016 | IMMU | 12,300 | $3.98 | $48,954 |
| 6/6/2016 | 6/8/2016 | IMMU | 63,959 | $4.0945 | $261,880.13 |
| 6/6/2016 | 6/8/2016 | IMMU | 110,322 | $4.0881 | $451,007.37 |
| 6/15/2015 | 6/16/2015 | IMMU | 210,991 | $4.08 | $860,569 |
| 6/10/2015 | 6/12/2015 | IMMU | 359,653 | $4.32 | $1,554,441 |

~~30.~~29. The Defendants listed in paragraphs 25 - 28 are referred to as the "Individual Defendants". Immunomedics and the Individual Defendants are collectively referred to herein as "Defendants".

~~31.~~30. The Goldenberg household (Goldenberg and Sullivan) income paid by IMMU since 2000 amounted to nearly 15% of IMMU market cap in December 2016.

~~32. Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Immunomedics' clinical results via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.~~

~~33. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, as alleged herein. The Individual Defendants collectively were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.~~

34. As officers and/or directors of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the United States federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each of the Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained in those materials.

36. Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Immunomedics securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Immunomedics's business, prospects, and the intrinsic value of its securities, and (ii) caused Lead Plaintiff and other shareholders to purchase Immunomedics securities at artificially inflated prices.

## V. FACTUAL BACKGROUND

### A. Immunomedics's Founding and History of Financial Losses

~~37.~~31. Immunomedics is a clinical-stage biopharmaceutical company developing monoclonal antibody-based products for the targeted treatment of cancer, autoimmune disorders, and other serious diseases. Defendant Goldenberg founded the Company in 1982.

~~38.~~32. The Company's portfolio of product candidates includes ADCs that are designed to deliver a specific payload of a chemotherapeutic agent directly to the tumor while reducing overall toxic effects that are usually found with conventional administration of these chemotherapeutic agents.

~~39.~~33. Since its founding in 1982, the Company has operated at a financial loss and it is likely that its operating expenses will continue to exceed its revenues for the foreseeable future. By June 30, 2016, the Company had an accumulated deficit of about $368.5 million. Its only significant sources of revenue in recent years came from a licensing agreement with a Belgian biotechnology company, UCB~~,~~ S.A., and a collaboration agreement with Bayer. On February 25, 2016, UCB notified Immunomedics that it was terminating that licensing agreement effective March 26, 2016.

~~40.~~34. Immunomedics's only product sales have been the limited sales of its diagnostic imaging product for which its patent protection expired. The Company's management has decided to focus on its therapeutic pipeline but has never had product sales of any therapeutic product. If the Company is unable to develop commercially viable therapeutic products or to license them to third parties, it is likely that Immunomedics will never achieve significant revenues or become profitable, either of which would jeopardize its ability to continue as an ongoing concern.

~~41.~~35. During the Class Period, Immunomedics's most advanced ADCs was sacituzumab goitecan (IMMU-132).

**B. Goldenberg and His Wife Sullivan Stood to Gain Substantial Monetary Compensation**

**1. As the Inventor and Patentee of IMMU-132 Defendant Goldenberg and His Wife, Defendant Sullivan, Stood to Personally Gain From Commercialization of IMMU-132 Through Royalties**

~~42.~~36. Pursuant to a License Agreement between Immunomedics and Goldenberg, certain patent applications owned by him were licensed to Immunomedics at the time of its formation in exchange for a royalty in the amount of 0.5% of the first $20.0 million of annual net sales of all products covered by any such patents and 0.25% of annual net sales of such products in excess of $20.0 million.[2]

~~43.~~37. In November 1993, the ownership rights of Immunomedics were extended as part of, and superseded by, Goldenberg's employment agreement, with Immunomedics agreeing to diligently pursue all ideas, discoveries, developments and products, into the entire medical field, which, at any time during his past or continuing employment by Immunomedics, Goldenberg has made or conceived or makes or conceives, or the making or conception of which he materially contributed to or contributes to, all as defined in his employment agreement.

~~44.~~38. Effective July 1, 2015, the Company entered into the amended and restated employment agreement with Goldenberg, extending the term of his employment for five years, until July 1, 2020.[3]

---

[2] Immunomedics ~~*2015*~~ , Annual Report (Form 10-K~~, SEC,~~) (Aug. 19, 2015), https://www.sec.gov/Archives/edgar/data/722830/000119312515296226/d28769d10k.htm ~~(last visited Sep. 28. 2017).~~.

[3] Immunomedics, Amended and Restated Employment Agreement by and between Immunomedics, Inc. and Dr. David M. Goldenberg Effective as of July 1, 2015, ~~SEC,~~

~~45.~~39. This agreement provided that Goldenberg was eligible to receive royalty payments on royalties received by the Company. For each fiscal year, the Company was obligated to pay Goldenberg a sum equal to a percentage of annual royalties the Company receives on each of the products for which Goldenberg is an inventor, and all products using, related to or derived from products for which Goldenberg is an inventor.[4] This agreement provided that such payments shall continue for each patented product for the remaining life of the patent covering each patented product (collectively "Patent Lifetime Royalty Payments").

**2. Goldenberg Stood to Gain Substantial Compensation ~~If~~if He Could Find Investors Willing to Partner or License IMMU-132**

~~46.~~40. Goldenberg's July 1, 2015 Amended and Restated Employment Agreement also provided that if Immunomedics completes a disposition during the term of Goldenberg's employment or within three years thereafter, of any one or more of Immunomedics's undeveloped assets for which he was an inventor, Immunomedics will pay him a sum equal to at least twenty percent, or more (as determined by the board of directors), of the consideration Immunomedics receives from each disposition, upon receipt.[5]

---

https://www.sec.gov/Archives/edgar/data/722830/000119312515253909/d82334dex101.htm ~~(last visited Sep. 28. 2017).~~.

[4] "Inventor" means a person(s) identified as an inventor of a patented product, formula or idea on the disclosures initially filed in the relevant patent office(s) for such patent.

[5] "Disposition" means any transfer, by way of sale, license or otherwise, to an unaffiliated third party, of any of Immunomedics's right, title or interest in or to any one or more of its products, technologies, intellectual property, businesses or other assets. Disposition includes any arrangements, whereby, Immunomedics combines with another entity and forms a new entity in which Immunomedics holds any ownership interest and to which Immunomedics transfers, by way of sale, license or otherwise, any of Immunomedics's right, title or interest in or to any one or more of its products, technologies, intellectual property, or businesses.

~~47.~~41. A search of the U.S. Patent and Trademark database reveals that Goldenberg is listed as an inventor and patentee of at least 22 of the 23 issued IMMU-132 patents.[6] As such, Goldenberg and Sullivan stood to personally and directly benefit from Immunomedics's independent commercialization or licensing of IMMU-132, the Company's flagship product.

**3. Goldenberg and Sullivan Stood to Gain By Any Run-Up of IMMU Stock Price Prior to Their Sale of Stock And They Exploited The ASCO Effect to Sell At Inflated Prices**

~~48.~~42. Defendants Goldenberg and Sullivan sold a significant number of IMMU shares in 2015 and 2016, at times when IMMU stock prices would be inflated by the ASCO Effect.

~~49.~~43. In May of 2015, Defendants announced that two of five of its abstracts had been accepted for presentation at the 51st ASCO Annual Meeting taking place in Chicago from May 29 to June 2, 2015. In the wake of Defendants' presentation of abstracts at that conference, the IMMU stock price traded at its peak prices for the month of June 2015.

~~50.~~44. It was at this time, while prices were elevated, that Defendants Goldenberg and Sullivan sold hundreds of thousands of IMMU shares for the first time since March 2009. Within two months, IMMU shares were trading at prices more than 60% lower than the elevated June ASCO Effect prices Defendants obtained for their sales.

~~51.~~45. From June 3-7, 2016, ASCO hosted its Annual Meeting in Chicago, and on June 24th and 25th hosted "The Best of ~~ACSO~~ASCO" in Chicago. In the weeks and months before these events, Defendants announced they were slated to present one of their abstracts on Friday,

[6] Search Results ~~*of Search*~~ in US Patent Collection database for~~:~~ IMMU-132, USPTO, http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=0&f=S&l=50&TERM1=IMMU-132&FIELD1=&co1=AND&TERM2=&FIELD2=&d=PTXT (last visited ~~Sep.~~May 28, ~~2017~~2019).

June 3, 2016, and again on June 24th. Individual Defendants Goldenberg and Sullivan would take advantage of the ASCO Effect by selling hundreds of thousands of shares of IMMU between Monday, June 6, 2016 and Monday, June 13, 2016. These were only Goldenberg's and Sullivan's second reported set of sales since acquiring their shares in March 2009.

~~52.~~46. Goldenberg and Sullivan did not sell shares in the many months where IMMU traded around $2 per share. Instead, they rode the wave of the ASCO Effect of the promise of presenting previously undisclosed results, and sold shares when prices were above $4 in 2015 and above $3 in 2016.

**C. Immunomedics's Campaign to Hype IMMU-132, Its Flagship Product**

~~53.~~47. At all relevant times, the Company's ADC business was its core operation and commercialization of its lead candidate, IMMU-132, assumed critical importance to Immunomedics's success.

~~54.~~48. Commenting on the Company's pipeline, journalist Adam Feuerstein remarked on January 25, 2017, "Immunomedics has been for sale for quite some time. The asset of interest to potential buyers is the experimental triple-negative breast cancer drug IMMU-132. (The rest of the company's pipeline essentially being offered for free.)"[7]

~~55.~~49. During the Class Period, Defendants persistently emphasized the ADC business and IMMU-132 in press releases, SEC filings, and during conference calls with securities analysts. Defendants were aware of developments regarding Immunomedics's flagship product and all matters affecting this business.

[7] Adam Feuerstein, ~~Adam.~~ *Immunomedics Sale Hinges on Proxy Battle Over Fate of Controversial Founder*, TheStreet~~,~~ (Jan 25, 2017, 10:55 AM), https://www.thestreet.com/story/13965475/1/ immunomedics-sale-hinges-on-proxy-battle-over-fate-of-controversial-founder.html.

~~56.~~50. In addition to Defendants' repeated focus on the ADC and IMMU-132 in the treatment of TNBC during conference calls and within press releases, they prominently described this operation within the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of Immunomedics's Form 10-Q for the period ending March 31, 2016 filed with the SEC on May 4, 2016:

> **Overview**
>
> Immunomedics is a clinical-stage biopharmaceutical company developing monoclonal antibody-based products for the targeted treatment of cancer, autoimmune disorders and other serious diseases. Our advanced proprietary technologies allow us to create humanized antibodies that can be used either alone in unlabeled or "naked" form, or conjugated with radioactive isotopes, chemotherapeutics, cytokines or toxins. Using these technologies, we have built a pipeline of eight clinical-stage product candidates.
>
> Our portfolio of investigational products includes antibody-drug conjugates ("ADCs") that are designed to deliver a specific payload of a chemotherapeutic directly to the tumor while reducing overall toxicities that are usually found with conventional administration of these chemotherapeutic agents. Our most advanced ADCs are sacituzumab govitecan ("IMMU-132") and labetuzumab govitecan ("IMMU-130"), which are in Phase 2 trials for a number of solid tumors and metastatic colorectal cancer ("mCRC"), respectively. Sacituzumab govitecan has received Breakthrough Therapy Designation from FDA for the treatment of patients with triple-negative breast cancer ("TNBC") who have failed at least two prior therapies for metastatic disease.[8]

**D. The ASCO Effect Inflates Biotech Stock Prices ~~Of~~of Companies That Present at the Annual Conference**

~~57.~~51. The American Society of Clinical Oncology ("ASCO") is a not-for-profit organization started by a group of physicians from the American Association of Cancer Research

[8] Immunomedics~~.~~, Quarterly Report (Form 10-Q~~, SEC,~~) (May 4, 2016), https://www.sec.gov/Archives/edgar/data/722830/000155837016005298/immu-20160331x10q.htm#Toc ~~(last visited Sep. 28, 2017).~~.

in 1964. ASCO's mission is to conquer cancer "through research, education, and promotion of the highest quality patient care."[9]

~~58.~~52. ASCO is now based in Alexandria, Virginia and has more than 40,000 members from all over the world. ASCO's annual four-day meeting is typically held in early June and tens of thousands of attendees show up to share ideas and learn about cancer breakthroughs from therapies and diagnostics. The ASCO annual conference attracts top clinicians and investigators boasting that it "will be recognized as the most trusted source of cancer information worldwide."

~~59.~~53. The ASCO annual conference is closely monitored by the biotechnology industry. Each year, several biotechnology companies working on oncology therapies see a massive surge in their stock prices starting with the announcement of abstracts being accepted for presentation, typically weeks or sometimes a few months before the ASCO meeting and fueled by investors' hopes that their pick will be amongst the ones that will steal the show at this year's meeting and attract further investors or suitors to the company. This stock price surge typically lasts from the announcement until weeks after the presentation and the annual conference are over, and the impact is digested. Investors know that pursuant to the norms set by ASCO, the new research to be presented at the conference is embargoed until the event starts. The embargo creates suspense among the investment community and attracts a lot of investors, as there are significant gains achievable with mitigated risk if the event is traded correctly. Biotech investors are well aware of this recognized effect ~~–~~ – called the "ASCO Effect".

[9] ASCO, https://www.asco.org/about-asco/asco-overview (last visited ~~Sep~~May 28, ~~2017~~2019).

**E. Defendants Exploited the ASCO Effect to Raise the Company's Profile and Attract a Licensing Partner**

~~60.~~54. Well aware of the ASCO Effect, for the two years prior to leading up to the Class Period (2014 and 2015), Defendants repeatedly publicized IMMU-132's potential, making sure to announce whenever ASCO accepted an IMMU-132 abstract for presentation at an ASCO Annual Meeting.

~~61.~~55. For example, during the May 8, 2014 earnings conference call, Goldenberg emphasized "[t]he IMMU-132 study involving multiple cancer types, will also be updated at the *2014 Annual Meeting of ASCO* on Monday, June 2 in a Poster Highlights Session . . . ."[10] This news drove the price of Immunomedics shares up approximately 4.6% to close at $3.21 on May 9, 2014.

~~62.~~56. On May 15, 2014, Defendants announced in a press release entitled "Immunomedics to Present Updated Phase II Results from Antibody-Drug Conjugate Programs at 2014 ASCO" that they would be making presentations on 5 product candidates at ASCO on June 1 and 2, 2014. The press release stated, "[t]hree of the 5 presentations will be on our antibody-drug conjugate (ADC) programs for solid cancers, including IMMU-132, which will be featured in a Poster Highlights Session." The press release detailed two IMMU-132-related presentations. The first, entitled "Characterization of an anti-TROP-2-SN-38 antibody-drug conjugate (IMMU-132) with potent activity against solid cancers", and listing Goldenberg as the first author, was scheduled for a General Poster Session. The second, entitled "IMMU-132, an

[10] ~~*Immunomedics*~~Immunomedics' (IMMU) CEO Cynthia Sullivan on F3Q 2014 Results - Earnings Call Transcript, SeekingAlpha~~,~~ (May 11, 2014, 5:32 AM), https://seekingalpha.com/article/2209373-immunomedics-immu-ceo-cynthia-sullivan-on-f3q-2014-results-earnings-call-transcript?part=single ~~(last visited Sep. 28, 2017).~~.

SN-38 antibody-drug conjugate (ADC) targeting TROP-2, as a novel platform for the therapy of diverse metastatic solid cancers: Clinical results", was scheduled for a Poster Highlights Session.~~[11]~~ From the initial announcement on May 8 to June 11, 2014, Immunomedics stock increased from $3.06 to close at $3.85, or about 26%:




~~63.~~57. The next year, as ASCO approached, Defendants were on a hunt for a licensing partner. During a May 7, 2015 earnings conference call with analysts, Goldenberg and Sullivan discussed ASCO, IMMU-132's regulatory status, their plan for FDA, Phase 3 trials, and the importance of bringing in a licensing partner to accomplish that plan:

> **Ryan Martins - Jefferies LLC, Research Division**
>
> Okay. And is that contingent on a partnership? Or you can do this yourself?
>
> **David M. Goldenberg**

~~[11] *Immunomedics May 15, 2014 Press Release*, Immunomedics, http://www.immunomedics.com/pdfs/news/2014/pr05152014.pdf (last visited Sep. 28, 2017).~~

Our plan is to bring a partner in. And we hope to have a partner in to do that with us. ~~That's~~That’s our plan. Our first indication, which ~~I'm~~I’m going to volunteer to discuss with you, is probably triple-negative breast cancer. But we have excellent data in the other tumors that I discussed and ~~there's~~there’s maybe more than 1 indication, and ~~that's~~that’s why ~~it's~~it’s important to have a partner on board.

* * *

**Matthew J. Andrews - Wells Fargo Securities, LLC, Research Division**

Okay. Great. And then I appreciate that the number of patients is small for a – when you split the dose for 8 and 10 with the non-small cell lung cancer cohort, but is there any meaningful difference in response CBR or PFS between the 2 doses at this point in time? Or are we going to get an update on that at ASCO in 3 weeks?

**David M. Goldenberg**

I think ~~you'll~~you’ll get an update at ASCO . . . .

**Matthew J. Andrews - Wells Fargo Securities, LLC, Research Division**

Okay. And just the last one. I think on the prior call, you had mentioned the 4 tumor types of interest with 132 were triple-negative non-small cell, small cell and colorectal. So is licensing of rights to the colorectal indication for 132 off the table since this was the indication you were planning to pursue for 130?

**David M. Goldenberg**

We are only discussing licensing with 132. 130, although there is interest ~~that's~~that’s been expressed and some discussions have begun in a very early phase, our interest is to license 132 because we hope to be in the – in sometime in the middle of 2016, in the registration trial. So we have to move on that.

**Matthew J. Andrews - Wells Fargo Securities, LLC, Research Division**

Yes, but would colorectal be part of that license? Or would you keep that for yourself so that you have 130 for that indication?

**David M. Goldenberg**

> The 132 would include all indications, including colorectal and pancreas . . . . I – and we want to check this with our advisers at ASCO, is how to develop the colorectal cancer in a registration trial while ~~we're~~we’re moving very quickly with triple-negative breast and non-small cell lung. So it requires a partner with as much of a commitment as we have, great interest and deep pockets to develop so many indications over the next few years.
>
> **Cynthia L. Sullivan**
>
> ~~I'll~~I’ll answer just that, Matt. I think with regard to your question, ~~it's~~it’s impossible to separate out certain indications. ~~We're~~We’re talking about out-licensing the asset IMMU-132 here. That ~~doesn't~~doesn’t mean that IMMU-130 ~~can't~~can’t also be developed in certain indications that are covered by 132. ~~It's~~It’s a different antibody, the expression occurs in some overlap and some other cancer types where the plan is to continue moving that forward as well. There is the potential for different combinations with the 130 as there is with 132. So ~~we're~~we’re not separating out indications, ~~we're~~we’re licensing an asset.[12]

~~64.~~58. In this one earnings call, Defendants demonstrated the importance of presenting at ASCO and the necessity of a licensing partner for IMMU-132 in order to take IMMU-132 through Phase 3 trials. These positive statements caused the price of Immunomedics shares to climb $0.18 from a closing price of $3.80 on May 7, 2015 to close at $3.98 on May 8, 2015 – a gain of about 4.7%.

~~65.~~59. On May 14, 2015, Defendants announced that two of their abstracts would be presented at ASCO’s annual conference in a press release entitled “Immunomedics Announces Five Presentations at 2015 ASCO Focusing on Antibody-Drug Conjugate Programs”:

> Immunomedics, Inc., (Nasdaq: IMMU) today announced *that two of its five abstracts submitted to the 2015 Annual Meeting of the*

[12] ~~*Immunomedics*~~Immunomedics’ (IMMU) CEO Cynthia Sullivan on Q3 2015 Results - Earnings Call Transcript, SeekingAlpha~~,~~ (Mar. 7, 2015, 5:00 PM), https://seekingalpha.com/article/3163826-immunomedics-immu-ceo-cynthia-sullivan-on-q3-2015-results-earnings-call-transcript?part=single (last visited Sep. 28, 2017).

> *American Society of Clinical Oncology (ASCO) have been accepted as oral presentations*.
>
> The two oral presentations will be on the Company's second-generation antibody-drug conjugate (ADC) programs for solid cancer therapy. Leading that program is [IMMU-132], an anti-TROP-2 antibody conjugated with SN-38, an active drug from irinotecan. Irinotecan is approved for the treatment of patients with colorectal cancer. Results from a Phase 2 study of [IMMU-132] in patients with advanced lung cancer will be updated in one of the 2 oral presentations. In addition to this oral presentation, results with [IMMU-132] in patients with late-stage triple-negative breast and gastrointestinal cancers will be reported in a Poster Discussion and a Poster Sessions, respectively.[13]

~~66.~~60. This news caused the price of Immunomedics shares to climb $0.05 from a closing price of $4.07 on May 14, 2015 to close at $4.12 on May 15, 2015 – a gain of about 1.2%. From the time of the May 7th announcement until after the ASCO presentation, Immunomedics stock price increased from $3.80 per share to $5.03 per share, or about 30%:

~~[13] *Immunomedics May 14, 2015 Press Release*, Immunomedics, http://www.immunomedics.com/pdfs/news/2015/pr05142015.pdf (last visited Sep. 28, 2017).~~




**F. Pre-Class Period Defendants Reach Agreement with FDA on Phase 3 Design and IMMU-132 Receives Breakthrough Therapy Designation**

~~67.~~61. On February 3, 2016, Defendants announced in a press release entitled "Immunomedics Announces Second Quarter Fiscal 2016 Results and Clinical Program Developments" and filed the press release with the SEC as an attachment to Form 8-K. Defendants identified two key products, the first of which was IMMU-132, for which the Company "ha[d] reached agreement with the U.S. Food and Drug Administration regarding a Special Protocol Assessment (SPA) on the design of a Phase 3 trial of [IMMU-132] for the treatment of patients with metastatic triple-negative breast cancer~~."~~ [mTNBC]."

~~68.~~62. On February 5, 2016, Defendants announced in a press release entitled "U.S. Food and Drug Administration (FDA) Grants Breakthrough Therapy Designation to Immunomedics for Sacituzumab Govitecan for the Treatment of Patients with Triple-Negative Breast Cancer" that the FDA's "Breakthrough Therapy Designation" was created to expedite the development and review of a drug that is intended, alone or in combination with one or more

other drugs, to treat a serious or life-threatening disease or condition, and where preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. Sullivan stated:

> IMMU-132 is also in Phase 2 trials in patients with advanced, heavily-pre-treated, non-small-cell lung cancer, small-cell lung cancer, and urothelial cancers, where encouraging results have been observed. The Trop-2 receptor targeted by this antibody-drug conjugate has increased expression in a large number of solid cancers. To date, we have enrolled about 300 patients with diverse cancer types.

~~69.~~63. As Goldenberg would later admit in his 2016 Annual Report "Chairman's Message", Defendants were focused on finding a partner, which was "essential":

> Our Company's mission is to be a leading, innovative biopharmaceutical company, dedicated to improving health and quality of life with novel immunotherapeutics for the treatment of cancer autoimmune and other serious diseases. I believe we, as a Company, are at the cusp of achieving this goal with sacituzumab govitecan (IMMU-132), our lead antibody-drug conjugate (ADC).

~~* * *~~

* * *

> Given the tremendous promise of IMMU-132 to treat such a broad range of solid tumors in patients with few treatment options, I feel a strong responsibility to bring this drug candidate to as many patients, in as many indications, as quickly as possible. In our corporate lifetime, we have been focused primarily on research and development. We recognize that we do not have all the resources required to realize the full healthcare potential of IMMU-132. *So it's essential, and we are focused, on finding the right partner, with the right resources, enthusiasm and steadfast devotion to bring*

> *IMMU-132 to every patient* who needs it in time to make a difference in their lives.[14]

**G. Defendants Submitted Abstracts for 2016 and Agreed to Abide by ASCO's Confidentiality Policy**

~~70.~~64. In February 2016, the Company submitted at least two IMMU-132 abstracts for presentation at the ASCO 2016 Annual Meeting scheduled for June 2016. Goldenberg is listed as an author on each of (a) "Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), acituzumab govitecan (IMMU-132): Phase II results", and (b) "Trop-2 as a therapeutic target for the antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132), in patients (pts) with previously treated metastatic small-cell lung cancer (mSCLC)."

~~71.~~65. Defendants had submitted numerous abstracts in prior years and knew that, by submitting abstracts to ASCO, they agreed not to disclose their data before ASCO's June 2016 Annual Meeting.

~~72.~~66. ASCO's Abstract Confidentiality Policy, which is publicly posted on their website and known to presenters and investors, requires all submitters to ~~"~~agree to the confidentiality policy, which states that all abstracts become final and confidential from the time of submission to any ASCO sponsored or ASCO co-sponsored meeting where ASCO is a lead sponsor.[15] Before the Annual Meeting, the abstract author or co-author, sponsor of the research,

---

[14] ~~*Immunomedics, Inc.*~~ Annual Report 2016, Immunomedics, ~~http~~https://www.immunomedics.com/~~pdfs/~~wp-content/uploads/2017/11/Immunomedics-2016-annual-report.pdf (last visited ~~Oct. 03, 2017~~May 28, 2019).

[15] Abstract Policies & Exceptions, ASCO, http://am.asco.org/abstracts/abstract-policies-exceptions (last visited Sep. ~~28, 2017).~~28, 2017). Also available at the January 23, 2016 capture at https://web.archive.org/web/20160123180209/http://am.asco.org/policies-and-exceptions (last visited May 28, 2019).

journalists, and others are barred from (a) making the information public, (b) providing it to others who may make it public, (c) publishing or presenting the information or providing it to others who do, and (d) providing the information to persons who may use the information to trade securities:

> Abstracts submitted to ASCO Meetings are considered final and confidential from the time of submission. The Confidentiality Policy covers all abstracts, including placeholder abstracts *and late-breaking data submission abstracts*. Compliance with the Confidentiality Policy by all parties related to the abstract is the responsibility of the First Author, and the First Author will be held accountable for any violations of ASCO's policy. Prior to the abstract information being publicly released in conjunction with an ASCO Meeting, the author, coauthors, sponsor of the research, journalists, and others may not:
>
> - Make the information public, or provide it to others who may make it public (such as news media);
> - Publish or present the information or provide it to others who may publish or present it; and
> - Use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes
>
> For a study to be eligible for acceptance into an ASCO Meeting, information contained in the abstract, as well as additional data and information to be presented about the study at the ASCO Meeting, ***must not be disclosed before the findings have been publicly released in conjunction with the ASCO Meeting***. If information from the abstract or additional study data are disclosed in advance of public release in conjunction with an ASCO Meeting, the abstract may be subject to rejection or removal unless an official Confidentiality Policy Exception applies (see below).

ASCO ANNUAL MEETING
COLLECTIVE WISDOM
2016
THE FUTURE OF PATIENT-CENTERED CARE AND RESEARCH

June 3-7, 2016
McCormick Place | Chicago, Illinois
#ASCO16

ASCO

ABOUT | REGISTRATION AND HOTELS | ABSTRACTS | PROGRAM | EXHIBITS | RESOURCES

Reserve Hotel | Register Now | Submit an Abstract

# POLICIES AND EXCEPTIONS

Confidentiality Policy and Exceptions | Exceptions to Date | Conflict of Interest Policy | Embargo and Release Information | Abstract Reuse/Resubmission

Upon submission of an abstract to any ASCO sponsored or ASCO cosponsored meeting where ASCO is the lead sponsor (each an ASCO Meeting and collectively, ASCO Meetings), the First Author must agree to the following Confidentiality Policy on behalf of all parties involved with the abstract. The first author is responsible for communicating this policy to all involved parties:

## Confidentiality Policy

Abstracts submitted to ASCO Meetings are considered final and confidential from the time of submission. The Confidentiality Policy covers all abstracts, including placeholder abstracts and Late-Breaking Data Submission abstracts. **Compliance with the Confidentiality Policy by all parties related to the abstract is the responsibility of the first author, and the first author will be held accountable for any violations of ASCO's policy.**

Prior to the abstract information being publicly released in conjunction with an ASCO Meeting, the author, coauthors, sponsor of the research, journalists, and others may not:

- make the information public, or provide it to others who may make it public (such as news media),
- publish or present the information or provide it to others who may publish or present it, or
- use the information for trading in the securities of any issuer, or provide it to others who may use it for securities trading purposes.

For a study to be eligible for acceptance into an ASCO Meeting, information contained in the abstract, as well as additional data and information to be presented about the study at the ASCO Meeting, must not be disclosed before the findings have been publicly released in conjunction with the ASCO Meeting. If information from the abstract or additional study data are disclosed in advance of public release in conjunction with an ASCO Meeting, the abstract will be subject to rejection or removal unless an official Confidentiality Policy Exception applies (see below).

**PRIOR PRESENTATION/PUBLICATION POLICY**

The contents and conclusions of the abstract must not be presented at any scientific, medical or educational meeting of 500 registrants or more or be published in a scientific, medical or educational publication (in any medium), in whole or in part, before the ASCO Meeting. ASCO cosponsored meetings represent an exception to this restriction on prior presentation and publication. Studies submitted to the Gastrointestinal Cancers Symposium, Genitourinary Cancers Symposium, Breast Cancer Symposium, Cancer Survivorship Symposium, Quality Care Symposium, or Palliative Care in Oncology Symposium, and other ASCO cosponsored meetings where ASCO is the lead sponsor are eligible for acceptance even if previously presented or published in the scientific, medical, or educational arena. Abstracts presented at these particular ASCO meetings may also be submitted for presentation at any other ASCO meeting. Authors are strongly encouraged to provide updated data in the abstract, as the novelty of the data will be taken into account during the abstract selection process. No new or updated data may be added to an abstract after it has been formally submitted unless it was formally submitted as a placeholder for a Late-Breaking Data Submission abstract.

**CONFIDENTIALITY POLICY EXCEPTIONS**

ASCO recognizes that certain federal and international laws require disclosure of certain clinical trial results through federal and international registries within a certain time period. If the imposed deadline for data submission falls before the ASCO Meeting dates, submission of the trial results to the required registry will not be viewed as a breach of ASCO's Confidentiality Policy.

Other than required disclosure of trial results through registries, exceptions to ASCO's Confidentiality Policy require communication with ASCO in advance of any public release, and a minimum of 48 hours' notice is requested. Specific inquiries about exceptions to ASCO's Confidentiality Policy should be emailed to SECexceptions@asco.org. A Securities and Exchange Commission (SEC) Exception applies to the extent necessary to comply with securities laws. Specific information and guidance on the SEC Exception is available from ASCO on the respective meeting website (i.e. Annual Meeting, Breast Cancer Symposium, etc.) under Abstracts > Policies and Exceptions.

Other Abstract Exceptions to the Confidentiality Policy may be granted by ASCO in extremely rare circumstances for public health reasons or to meet the requirements of state, national, or international government agencies. In these rare cases, requests should be directed to SECexceptions@asco.org for step-by-step guidance.

Regardless of whether a Confidentiality Policy Exception applies or is granted, ASCO retains the right, in its discretion, to change an abstract's placement in the meeting program based on the extent of information disclosed. If an exception applies or is granted, the study will most likely be ineligible for the official press program for the ASCO meeting.

~~73.~~67. Thus, Defendants also knew that if ASCO discovered any breach of this embargo policy, ASCO could eliminate an accepted abstract from its Annual Meeting

presentations as punishment for breaching ASCO's Confidentiality Policy.[16] As of May 31, 2016, ASCO had not granted any exceptions to this policy[17]:




~~74.~~68. Moreover, Defendants knew as far back as 2014 ~~what was likely to happen if they breached the~~about this confidentiality policy. They previously submitted at least two abstracts to ASCO co-authored by Goldenberg in connection with its 2014 and 2015 Annual Meetings.[18]

[16] ~~ASCO~~ Abstract Policies & Exceptions, *supra* ~~at footnote 15~~note 13.

[17] https://web.archive.org/web/20160531060559/http://am.asco.org/policies-and-exceptions

[18] Compare same policy in 2015 at https://web.archive.org/web/20150429191507/http://am.asco.org/policies-and-exceptions.

## ~~VI. DEFENDANTS MADE FALSE AND/OR MISLEADING STATEMENTS ABOUT THEIR SUBMISSIONS TO ASCO AND PROMISED NEW DATA DURING THE CLASS PERIOD~~

## H. Defendants Announce "Updated TNBC Results" to Be Presented At ASCO

~~75.~~69. Immunomedics's viability as an ongoing research and development business hinged on Defendants' ability to keep the Company's stock price high and to lure in a licensing partner to take IMMU-132 through Phase 3 trials, get approval, and commercially market the drug. Only then would Defendants Goldenberg and Sullivan profit from their patents on IMMU-132.

~~76.~~70. During the Class Period, Defendants repeatedly took advantage of the ASCO Effect of promised new data and results of such significance that it was accepted by ASCO, in a campaign to publicize their IMMU-132 abstract presentations at the upcoming ASCO 2016 Annual Meeting. They used press releases, earnings conference calls with securities analysts and other means to broadcast their achievement.

~~77.~~71. On April 19, 2016, after the market closed, Immunomedics issued a press release announcing that they would present "*[u]pdated results* in triple-negative breast and non-small-cell lung cancers" at "two Clinical Science Symposia during the upcoming ASCO Annual Meeting in June." The press release, entitled "Immunomedics Reports ~~Sacitiuzumab~~Sacituzumab Govitecan (IMMU-~~122~~132) Shows Significant Clinical Activity in Metastatic Urothelial Cancer," emphasized the importance of their flagship product and, separately highlighted the acceptance for presentation of their abstracts on IMMU-132 for the treatment of TNBC and non-small-cell lung cancers (NSCLC) at the ASCO conference:

> Immunomedics, Inc. (Nasdaq: IMMU) today announced that *~~sacitiuzmab~~sacituzumab govitecan, its lead investigational antibody-drug conjugate (ADC),* produced meaningful clinical benefit to patients with relapsed or refractory metastatic urothelial cancer. Among the 19 patients enrolled into the open-label Phase 2

study, at the time of analysis the interim median PFS was 6.9 months, based on RECIST 1.1, and interim mean OS was 11.4 months, with 84% of patients still alive. Expression of Trop-2, a cell-surface protein targeted by the ADC, is not a pre-selection criterion for patient enrollment.

* * *

* * *

"We are very encouraged by these results in metastatic urothelial cancer, which warrant a regulatory strategy similar to triple-negative breast cancer should these results continue to be robust," remarked Cynthia L. Sullivan, President and Chief Executive Officer. ***"Updated results in triple-*****negative breast and non-small-cell lung cancers** ***will be presented at two Clinical Science Symposia during the upcoming ASCO Annual Meeting in June."***

Sacituzumab has received Breakthrough Therapy designation from the FDA for the treatment of patients with triple-negative breast cancer who have failed prior therapies for metastatic disease.[19]

78. These positive statements causedOn April 29, 2016, Defendants Publish the price of Immunomedics shares to climb $0.02 from a close of $2.95 on April 19, 2016 to closeTNBC IMMU-132 data at $2.97 on April 20, 2016 – a gain of about .7% – and the share price continued to climb during Boston PEGS Conference (in violation of the next several trading days.

**79.I. The April 19th statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants were scheduled to make a presentation at an upcoming conference yet failed to disclose: (1) that they would breach thatwell-known ASCO embargo by presenting their abstract information, contents or conclusions at the conference prior to the ASCO June 2016 conference; (2) that the presentation at the conference ahead of ASCO would be materially) without telling investors that it is the same data, information,**

[19] *Immunomedics April 19, 2016 Press Release*, Immunomedics, http://www.immunomedics.com/pdfs/news/2016/pr04192016.pdf (last visited Sep 28, 2017).

**content or conclusions, at least with respect to TNBC; and that no materially new updated results would be presented at ASCO. they will present at ASCO**

80.72. On April 29, 2016, Defendants presented IMMU-132 data at the 12th Annual Protein and Antibody Engineering Summit (PEGS) Boston conference. Defendants also issued a press release entitled "Immunomedics Reports Responses With Sacituzumab Govitecan (IMMU-132) In Patients With Metastatic Solid Cancers Who Failed Prior Checkpoint-Inhibitor Therapy". The press release announced that IMMU-132 had "achieved" the "objective durable responses [with IMMU-132] in a number of patients with advanced, metastatic solid cancers, after failing multiple prior therapies, some including checkpoint inhibitors (CPIs)." The press release also announced the Defendant Goldenberg presented "updated, interim Phase 2 results" for IMMU-132 and summarized the treatment responses in a table contained in the press release for TNBC, NSCLC, SCLC and urothelial cancer (UC). The press release went on in detail to discuss some of the other data and results presented, but never stated that this information and these results were the same as the information and TNBC "updated results" that had been accepted and that they intended to be presentedpresent at the upcoming ASCO meetings.

81. The April 29, 2016 announcement caused the price of Immunomedics shares to climb $0.13 from a closing price of $3.55 on April 29, 2016 to close at $3.68 on May 2, 2016 – a gain of about 3.7%.

82.73. The April 29th announcement omitteddid not disclose that Defendant Goldenberg's presentation at PEGS Boston 2016 contained the same TNBC "updated results" and ASCO embargoed information, contents and/or conclusions that were materially the same information, contents or conclusions that Defendants were to present at ASCO with respect to IMMU-132, and that this presentation violated the ASCO embargo policy. The April 29th statements were also false and/or misleading, or omitted stating material information necessary

~~to make the statements not misleading as Defendants knew: (1) they~~ had been accepted to be presented ~~materially the same information, content or conclusions at the PEGS conference; (2) they were bound by ASCO's embargo policy and knew that they had breached that embargo by presenting the materially same information, content or conclusions at another conference prior to the ASCO~~ at the June ~~2016 conference; (3) that breaching the embargo policy could result in ejection from the ASCO conference; and (4) that no new or updated information, content or conclusions were forthcoming at the~~ ASCO conferences~~, thereby causing investors to purchase IMMU shares at artificially inflated prices~~ to TNBC and IMMU-132.

## VI. DEFENDANTS FALSELY PROMISE NEW PREVIOUSLY UNDISCLOSED UPDATED TNBC RESULTS TO BE PRESENTED AT ASCO ON JUNE 3RD AND 24TH

~~83.~~74. On May 2, 2016, Defendants ~~promoted~~announced the acceptance of their upcoming TNBC/IMMU-132 abstract of *new information* also at "The Best of ASCO" conference (another ASCO sponsored event) to be held on June 24 and 25, 2016 in Chicago. In a press release entitled "Immunomedics Announces Abstract On Sacituzumab Govitecan (IMMU-132) In Patients With Triple-Negative Breast Cancer Selected For Best Of ASCO Program", Defendants stated:

> Immunomedics, Inc. (Nasdaq: IMMU) ***today announced that the abstract on sacituzumab govitecan (IMMU-132), the Company's lead antibody-drug conjugate (ADC), in patients with triple-negative breast cancer (TNBC) has been selected as part of the Best of ASCO Program***, which features the top abstracts from this year's ASCO Annual Meeting for their practice on changing research.
>
> "We are honored to receive ***this important recognition from our peers at ASCO for the significant impact our results to-date*** with the anti-Trop-2-SN-38 conjugate have in patients with TNBC," commented Cynthia L. Sullivan, President and Chief Executive Officer of Immunomedics. "We are working diligently to make this valuable asset available expeditiously to fill the unmet need of these patients, including our out-licensing efforts for future clinical

> developments and commercialization in this and other difficult-to-treat solid cancer indications," she further remarked.
>
> ***The Best of ASCO Program will be held at the Palmer House Hilton in Chicago, Illinois from June 24-25, 2016***. The Company's presentation is scheduled at the Breast Cancer – Triple-Negative/Cytotoxic Chemotherapy/Local Therapy Session for Friday, ***June 24*** at 9am – - 9:40 am Central Time.[20]

~~84.~~75. Defendants publicized designation of their TNBC abstract as a "Best of ASCO" in the press release because selection of an abstract as "Best of ASCO" program is a highly coveted and prestigious honor. This distinguished selection raises the visibility of any company. ASCO defines "Best of ASCO Programs" as highlighting:

> [T]he most cutting-edge science and education from the world's premier oncology event, the ASCO Annual Meeting, into a two-day program. *The abstracts chosen for presentation and discussion reflect the foremost research and strategies in oncology that will directly impact patient care.* Expert faculty will place abstract findings into clinical context and discuss how the results may change the current standard of care. The Meetings' smaller size allows for ample time for audience participation and attendee interaction.[21]

~~85.~~76. These positive statements caused the price of Immunomedics shares to climb another $0.07 from a closing price of $3.68 on May 2, 2016 to close at $3.75 on May 3, 2016 – a gain of about 2%. Again, investors were unaware that Goldenberg breached ASCO's policy and exposed the Company to risks associated with ASCO's discovery.

~~86.~~77. These statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants knew: (1) they had

---

~~[20] *Immunomedics May 2, 2016 Press Release*, Immunomedics, http://www.immunomedics.com/pdfs/news/2016/pr05022016.pdf (last visited Sep. 28, 2017).~~

[21] Best of ASCO, https://boa.asco.org/ (last visited Sep. 28, 2017).

presented materially the same information, content or conclusions at a prior conference in April; (2) they were bound by ASCO's embargo policy and knew that they had breached that embargo by presenting the materially same information, content or conclusions at another conference prior to the ASCO June 2016 conference; (3) that breaching the embargo policy could result in ejection from the ASCO conference; and (4and (2) that no new or updated information, content or conclusions were forthcoming at the ASCO or Best of ASCO conferences, thereby causing investors to purchase IMMU shares at artificially inflated prices.

87.78. On May 4, 2016, after the market closed, Defendants again promoted their ASCO participation, promisedJune 3rd presentation at the Annual ASCO conference, promising "key updates" of IMMU-132 with TNBC, NSCLC, and SCLC in a press release entitled "Immunomedics Announces Third Quarter Fiscal 2016 Results and Clinical Program Developments," and filed a Current Report on Form 8-K with the SEC:

> "Our current estimated expenses and cash flows are tracking close to the low end of our fiscal 2016 guidance," commented Peter P. Pfreundschuh, Vice President Finance and Chief Financial Officer. "We believe FDA's Breakthrough Therapy Designation in triple-negative breast cancer is recognition of the significant potential of sacituzumab govitecan, which continues to produce encouraging safety and efficacy results in a number of difficult-to-treat solid cancers. We are very encouraged by the results in metastatic urothelial cancer, as recently reported by our clinical investigator at the AACR Annual Meeting. ***Key updates in triple-negative breast cancer, as well as non-small-cell and small-cell lung cancers will be provided at ASCO next month***," added Mr. Pfreundschuh.
>
> The Company's key clinical developments and future planned activities:
>
> Sacituzumab Govitecan (IMMU-132)

* * *

- *Updated Phase 2 results in patients with metastatic triple-negative breast cancer will be presented in a Clinical Science Symposium Session at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting on Friday, June 3, 2016*.

While the press release also discusses the presentation of various results of various cancers including "advanced metastatic solid cancers" at the Boston PEGS conference, the press release nowhere negates that "*updated* Phase 2 results for with metastatic triple-negative breast cancer will be presented in a Clinical Science Symposium Session at the 2016 American Society of Clinical Oncology (ASCO) Annual Meeting on Friday, June 3, 2016."

~~88.~~79. The May 4th statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants knew: (1) they had presented materially the same TNBC data and results at ~~a~~the prior Boston PEGS conference in April~~; (2) were bound by ASCO's embargo policy~~ and ~~knew that they had breached that embargo by presenting the materially same data at another conference prior to the ASCO June 2016 conference; (3) that breaching the embargo policy could result in ejection from the ASCO conference; and (4)~~ (2) that no new TNBC data, results, key information, content or conclusions were to be forthcoming at the ASCO or Best of ASCO conferences, thereby causing investors to purchase IMMU shares at artificially inflated prices.

~~89.~~80. On May 5, 2016, Defendants hosted a conference call with securities analysts during which they again promoted the IMMU-132 TNBC abstract accepted for the Best of ASCO and the upcoming ASCO Annual conference presentations, and again noted publicly that they were looking for a partner to run trials. Individual Defendant Sullivan specifically stressed the importance of IMMU-132, its breakthrough therapy designation, their desire for a partner, and the ASCO and the Best of ASCO presentations:

As was recently announced, our peers at the American Society of Clinical Oncology or ASCO selected our IMMU-132 abstract on TNBC, as part of their best of ASCO program, which features the top abstract from this year'syear's ASCO Annual Meeting for "“practice changing research".”. That will be held at a later date. At the ASCO Meeting, our oral presentation on TNBC will be at a Clinical Science Symposium Session on breast cancer. Additionally, our abstract in patients with non-small cell lung cancer has also been selected for oral presentation at another Clinical Science Symposium session that focuses on lung cancer. Second only to a plenary session, these Clinical Science Symposium sessions are an important part of the ASCO program for companies to showcase the strength of their clinical data, in terms of applicability of their product candidates and clinical practice.[22]

*[I]t is this belief of IMMU-132's broad applicability that's driven us to decide the out license the agent in order for its potential to be fully developed.* Therefore, in selecting a corporate partner for the future clinical development and commercialization of IMMU-132, *we desire a partner that has the rare result to conduct multiple Phase 2 trials in addition to the Phase 3 trial in triple negative breast cancer*, which we filed with the FDA. More importantly, we're looking for a company that shares our commitment to further explore IMMU-132 in other solid cancers. Along this line, *the efforts to complete a licensing arrangement for IMMU-132 are continuing and we're pleased with the interest we have received.*[23]

90. The May 5th statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants knew: (1) they had presented materially the same information, content or conclusions at a prior conference in April; (2) they were bound by ASCO's embargo policy and knew that they had breached that embargo by presenting the materially same information, content or conclusions at another conference prior to the ASCO June 2016 conference; (3) that breaching the embargo policy could result in

[22] Immunomedics' (IMMU) CEO Cynthia Sullivan on Q3 2016 Results - Earnings Call Transcript, SeekingAlpha (May 6, 2016, 7:34 AM), http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=3972236&Title=immunomedics-immu-ceo-cynthia-sullivan-on-q3-2016-results-earnings-call-transcript (last visited May 28, 2019).

[23] *Immunomedics Q3 2016 Earnings Call Transcript*, Nasdaq, http://www.nasdaq.com/aspx/call-transcript.aspx?StoryId=3972236&Title=immunomedics-immu-ceo-cynthia-sullivan-on-q3-2016-results-earnings-call-transcript (last visited Sep. 28. 2017).

ejection from the ASCO conference; and (4) that no new data or updated results or information, content or conclusions were forthcoming at the ASCO or Best of ASCO conferences, thereby causing investors to purchase IMMU shares at artificially inflated prices.

91.81. Individual Defendant Goldenberg also spoke and stressed the importance of IMMU-132 data and promoted the upcoming ASCO presentations:

> We cannot compute overall survival yet, because as of December 2015, 83 patients were still alive. However, we hope to update these results at the forthcoming Annual Meeting of the American Society of Clinical Oncology or ASCO, where [indiscernible] will make an oral presentation on our results in TNBC. [. . . .][24]

> [*R*]*esults in non-small cell lung cancer patients also will be updated in ASCO*, with Dr. K. Mitch of the University of Colorado Cancer Center will give an oral presentation of our latest results. But I can relate it at this time, that's in so many non-small cell lung cancer patients are receiving the new checkpoint inhibiting agents, we are enrolling many who has failed or relapsed 00:23:32 [indiscernible] prevention. . . .

> Progression free survival on an intent-to-treat base, are all 28 patients enrolled was 2.1 months. Our median overall survival measured last December was 8.1 months, we believe this survival is meaningful for such patients mostly in at least the third line setting in this very aggressive cancer. *This trial will also be updated at ASCO* with Dr. Starodub of Indiana University Health Center for Cancer Care will present a poster.[25]

92.82. In response to the statements made by Individual Defendants Sullivan and Goldenberg, the price of ImmunomedicsIMMU shares climbed $0.40 during the next two trading days from a closing price of $3.46 on May 5, 2016 to close at $3.86 on May 9, 2016 – a gain of about 11.5%.

---

[24] Immunomedics' (IMMU) CEO Cynthia Sullivan on Q3 2016 Results - Earnings Call Transcript, *supra* note 18.

[25] *Immunomedics Q3 2016 Earnings Call Transcript*, SeekingAlpha, https://seekingalpha.com/article/3972236-immunomedics-immu-ceo-cynthia-sullivan-q3-2016-results-earnings-call-transcript?part=single (last visited Sep 28, 2017).

93.83. These statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants knew: (1) they had presented materially the same information, content or conclusions at a prior conference in April; (2) they were bound by ASCO's embargo policy and knew that they had breached that embargo by presenting the materially same information, content or conclusions at another conference prior to the ASCO June 2016 conference; (3) that breaching the embargo policy could result in ejection from the ASCO conference; and (4) that no new data or updated results or information, content or conclusions were forthcoming at the ASCO or Best of ASCO conferences, thereby causing investors to purchase IMMU shares at artificially inflated prices.

94.84. On May 19, 2016, Defendants announced in a press release entitled "Immunomedics To Report Updated Results For Sacituzumab Govitecan (IMMU-132) In Breast And Lung Cancers At Clinical Science Symposia Of 2016 ASCO Annual Meeting" that Immunomedics had been selected to present two abstracts and three presentations at the ASCO meeting on June 3, June 4, and June 6, 2016, each of which related to IMMU-132:

> Immunomedics, Inc. (Nasdaq: IMMU) today announced that the Scientific Program Committee of the *American Society of Clinical Oncology (ASCO) has selected two of the Company's abstracts for oral presentation at two Clinical Science Symposium Sessions during their 2016 Annual Meeting*, scheduled for June 3 - 7, 2016 at McCormick Place Convention Center in Chicago, Illinois. Both abstracts are on sacituzumab govitecan, or IMMU-132, the Company's lead antibody-drug conjugate (ADC). Sacituzumab govitecan has previously been designated by the FDA a Breakthrough Therapy for the treatment of patients with triple-negative breast cancer (TNBC) who have failed prior therapies for metastatic disease.
>
> The first abstract is a Late-Breaking Abstract on updated results from a Phase 2 study of the ADC in patients with metastatic TNBC. This abstract has also been selected as part of the Best of ASCO Program, which features top abstracts from this year's ASCO Annual Meeting for their practice changing research. Results in

> patients with metastatic non-small-cell lung cancer will be updated in another Clinical Science Symposium Session that focuses on lung cancers. In addition to these two oral presentations, a poster presentation of results with sacituzumab govitecan in patients with metastatic small-cell lung cancer will also be given.[26]

The press release then set out the dates, times, location and title of each presentation.

95.85. These positive statements caused the price of ImmunomedicsIMMU shares to climb $0.32 from a closing price of $3.85 on May 18, 2016 to close at $4.17 on May 19, 2016 – again of about 8.3%. Again, investors were unaware of Goldenberg's breach and the attendant risks if ASCO found out.

96.86. The May 19th statements were false and/or misleading, or omitted stating material information necessary to make the statements not misleading as Defendants knew: (1) they had presented that this was materially the same information, content or conclusions already presented at a priorthe Boston PEGS conference in April; (2) they were bound by ASCO's embargo policy and knew that they had breached that embargo by presenting the materially same information, content or conclusions at another conference prior to the ASCO June 2016 conference; (3) that breaching the embargo policy could result in ejection from the ASCO conference; and (4(2) that no new data or updated results or information, content or conclusions were forthcoming at the ASCO or Best of ASCO conferences, thereby causing investors to purchase IMMU shares at artificially inflated prices.

97.87. As the June 2016 ASCO Annual Meeting approached, the price of ImmunomedicsIMMU shares steadily rose $1.13 on heavy volume from a closing price of $4.17 on May 19, 2016 to close at $5.30 on June 2, 2016 – a gain of about 27%. From the time

[26] *Immunomedics May 19, 2016 Press Release*, Immunomedics, http://www.immunomedics.com/pdfs/news/2016/pr05192016.pdf (last visited Sep. 28, 2017).

Defendants first started promoting the ASCO presentations on April 19, 2016, until the day before the first scheduled ASCO presentation on June 2, 2016, Immunomedics stock rose from $2.95 to $5.30, or about 80%, as demonstrated below:






98.88. Defendants' statements in paragraphs 75 - 9774 - 87 were also materially false and/or misleading in that Defendants failed to disclose or omitted information necessary to make statements not misleading to reasonable investors, in that Goldenberg violated ASCO's Confidentiality Policy by (a) presentingDefendants (a) had already presented the same IMMU-132 or substantially the same data, information, content or conclusions at PEGS Boston 2016 during late April 2016, (b) discussing details of his PEGS Boston 2016 presentation during the May 5, 2016 conference call, and (c) publishing the PEGS Boston presentation on the Company's website. Defendants were also aware that ASCO could, as a result of the breach(es), reject or remove the IMMU-132 abstracts before the June 2016 Annual Meeting. Moreover, ASCO's eventual removal, and Defendants' failure to present or publish new data, information, content or conclusions, supports the conclusion that Defendants did not in fact have updated IMMU-132 data to present. Instead, Defendants tried to reuse previously disclosed IMMU-132 data, information, content or conclusions at ASCO's 2016 Annual Meeting.revealed the "updated results during the May 5, 2016 conference call, and published the data and results on the Company's website, and that (b) therefore, Defendants planned presentations had no new data to be published at the ASCO meetings on June 3rd and 24th. Defendants' conduct caused investors to purchase IMMU shares at artificially inflated prices and injured those investors.

## VII. THE TRUTH EMERGESBEGINS TO EMERGE

99.89. By June 32, 2016, ASCO discovered Defendants' attempt to sneak inhad previously disclosed data and terminated the "Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results" presentation.

~~100.~~90. On June 3, 2016, Defendants announced ASCO's discovery and its ejection in a press release entitled "Immunomedics Provides Update On Triple-Negative Breast Cancer Presentation At ASCO":

> Immunomedics, Inc. (Nasdaq: IMMU) today announced that the Company was advised late yesterday that its abstract, "Therapy of refractory/relapsed metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results," planned for oral presentation today and selected by the American Society of Clinical Oncology (ASCO) for its Press Briefing, was cancelled because of a complaint that the Company violated the embargo by reporting results presented by its Chairman at a conference in April. It appears the complaint was made by a third party contacting ASCO. No question was raised on the quality of the results. Immunomedics President and Chief Executive Officer, Cynthia L. Sullivan, remarked: "The presenter, Dr. Bardia, and I are attempting to reverse this with ASCO, because we believe the patient population and results reported in April were different from those in the ASCO abstract submitted last February . . . ."

~~101.~~91. This statement was false and misleading because (1) the data, results, information, content or conclusions were not materially different, ~~and because~~(2) the presenter, Dr. Bardia, had not been told that the data had been previously presented *and had no belief,* as stated in the press release, that the patient population and results reported in April were different from those he was to present at ASCO, and (3) it implied that there was still a basis for the abstract to be presented at the upcoming June 24th "Best of ASCO" conference to be held in Chicago.

~~102.~~92. On June 3, 2016, *TheStreet*'s Adam Feuerstein summarized the events in an article entitled "Immunomedics Kicked Out of Prestigious ASCO Cancer Conference":

> Immunomedics (IMMU) was caught trying to sneak old, previously presented clinical data on its triple-negative breast cancer drug IMMU-132 into the American Society of Clinical Oncology (ASCO) annual meeting, which starts Friday.

That's a violation of ASCO's rules. As a result, ASCO informed Immunomedics Thursday that the IMMU-132 breast cancer abstract was removed from the meeting.

"Since the confidentiality of this abstract was violated, the abstract and presentation have been removed from the meeting and will no longer be featured in our press program," Alise Fisher, program coordinator in ASCO's science communications department, said in an email Thursday night.

* * *

ASCO accepted the company's late-breaking abstract for IMMU-132 into the annual meeting on the premise that it contained updated *and previously undisclosed results* from a mid-stage study in triple-negative breast cancer. But Immunomedics failed to tell ASCO that the IMMU-132 data were not updated or new at all.

Immunomedics Founder and Chief Scientific Officer David Goldenberg had already presented the same IMMU-132 trial results at an industry networking meeting in April, ASCO learned.

The company issued a press release when these IMMU-132 data were presented in April, posted the presentation slides on its web site and discussed the data with investors on a conference call.

Immunomedics also never told Dr. Aditya Bardia of Harvard Medical School, the principal investigator of the IMMU-132 breast cancer study and the scheduled ASCO presenter, about the April data reveal, ***Bardia told me in an interview on Wednesday.***

Investors look to the ASCO meeting, held in June each year, for the latest developments and newest clinical data on experimental cancer drugs.

On a recent conference call with investors, Goldenberg and his wife, Immunomedics CEO Cynthia Sullivan, played up the importance of the IMMU-132 ASCO presentation. Coupled with Breakthrough Therapy Designation granted to the drug by FDA in February, the

> company hopes to win approval of its first drug after 34 years of research efforts . . . .
>
> Immunomedics stock price has risen by 70% since April 20, when ASCO announced the inclusion of the IMMu-132 breast cancer data as part of its media briefing program for the annual meeting . . . .

~~103.~~93. This news drove the price of Immunomedics shares down $0.78 from a closing price of $5.30 on June 2, 2016 to close at $4.52 on June 3, 2016 – a loss of about 14.7%.

~~104.~~94. Still, before the truth would be fully disclosed – and as investors held out that "updated results" different from those presented at the Boston PEGS conference would be presented at on June 24th at the "Best of ASCO" in Chicago, Defendants Goldenberg and Sullivan sold nearly 1.29 million shares of IMMU between June 6 and the next trading day, June 8, and again between June 10 and 13, 2016. They sold those shares at prices between $3.02 and $4.095.

~~105.~~95. On June 21, 2016, Immunomedics announced that Defendant Pfreundschuh resigned as CFO of Immunomedics. That day, Wells Fargo downgraded its rating of Immunomedics stating, "We are downgrading our rating on shares of IMMU to Market Perform (from Outperform) and reducing our valuation range to $1.75 to $2.25 (from $8 - $9) following today's news and a series of management missteps that have shaken our confidence in IMMU's ability to create sustainable shareholder value."

~~106.~~96. In response to this news, the price of Immunomedics shares fell $0.13 from a closing price of $2.53 on June 20, 2016 to close at $2.40 on June 22, 2016 – a loss of about 5.1%.

## VIII. THE TRUTH FULLY EMERGES – THERE WERE NO NEW "UPDATED RESULTS"

~~107.~~97. On June 25th, the Best of ASCO 2016 meeting concluded without a presentation by Immunomedics as Immunomedics had publicized. No explanation was ever offered by Defendants as to their failure to reverse ASCO's decision and failure to substantiate the claim that the data was different. Rather, they remained silent as to the failure to present and have not said anything since. By the next trading day, June 24, Immunomedics stock dropped $0.33 from a closing price of $2.50 on June 23, 2016 to close at $2.17 on June 24, 2016 – a loss of about 13.2%.

98. Any doubt of ASCO's finding was resolved by ASCO publishing, on its website for the Journal of Clinical Oncology, that the abstract entitled "Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results" had been retracted because it violated ASCO's embargo and confidentiality policy[27]:

[27] *Efficacy and Safety of Anti-Trop-2 Antibody Drug Conjugate Sacituzumab Govitecan (IMMU-132) in Heavily Pretreated Patients With Metastatic Triple-Negative Breast Cancer,* Journal of Clinical Oncology, ASCO (retracted) https://ascopubs.org/doi/10.1200/JCO.2016.70.8297 (Last visited May 28, 2019).

Journal of Clinical Oncology®
An American Society of Clinical Oncology Journal

Enter words / phrases / DOI / ISBN / authors / keywords / etc.

Newest Articles | Issues | Browse By Topic | Special Content | Authors | Subscribers

BREAST CANCER—HER2/ER

## Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with an anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results.

Aditya Bardia, Jennifer Robinson Diamond, Wells A. Messersmith, Ingrid A. Mayer, Steven J. Isakoff, Vandana Gupta Abramson, ...

Show More

Abstract Disclosures

Abstract

LBA509

**Notice of Retraction:** "Therapy of relapsed/refractory metastatic triple-negative breast cancer (mTNBC) with anti-Trop-2-SN-38 antibody-drug conjugate (ADC), sacituzumab govitecan (IMMU-132): Phase II results." ASCO's Confidentiality Policy requires that abstracts be considered confidential and embargoed from the time of submission until the findings have been publicly released in conjunction with the ASCO Annual Meeting. Abstract LBA509, published in the 2016 ASCO Annual Meeting Proceedings Part II, violated this policy and was retracted from publication and presentation at the 2016 ASCO Annual Meeting.

Defendants' have claimed in pleadings to this Court (ECF 25-1 at n. 10) that ASCO eventually published this article citing Exhibit 10 to Declaration of John B. Pendleton (ECF No. 25-13). To the extent that this abstract entitled "Efficacy and Safety of Anti-Trop-2 Antibody Drug Conjugate Sacituzumab Govitecan (IMMU-132) in Heavily Pretreated Patients With Metastatic

Triple-Negative Breast Cancer" published in March 2017 is in fact the same abstract Defendants were to present at the June 3rd and 24th ASCO meetings, Defendants now admit that this report contains the same information presented at the PEGS conference – *and two prior conferences* – in violation of the ASCO embargo. At the end of the abstract, the authors, including Defendant Goldenberg, state:

> ***Prior Presentation***
>
> Presented at the AACR-NCI-EORTC International Conference on Molecular Targets and Cancer Therapeutics, Boston, MA, November 5-9, 2015; 38th Annual San Antonio Breast Cancer Symposium, San Antonio, TX, December 8-12, 2015; 12th Annual Protein and Antibody Engineering Summit, Boston, MA, April 25-29, 2016; and 39th Annual San Antonio Breast Cancer Symposium, San Antonio, TX, December 6-10, 2016.
>
> 8 © 2017 by American Society of Clinical Oncology JOURNAL OF CLINICAL ONCOLOGY

~~108.~~99. In all, as the ~~confusing and~~ contradictory information was being digested by investors, and the truth that no new data or updated results would be forthcoming, the price of ~~Immunomedics~~IMMU dropped $3.30 from a closing price of $5.30 on June 2, 2016 to close at $2.00 on June 27, 2016 – a loss of about 62.3%.






## ~~VIII.~~IX. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

~~109.~~100. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Immunomedics securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are any judicial officer who handles this matter, Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

~~110.~~101. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Immunomedics securities were actively traded on the ~~NASDAQ~~Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and

other members of the Class may be identified from records maintained by Immunomedics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

~~111.~~102. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~112.~~103. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

~~113.~~104. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;
- Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Immunomedics;
- Whether the Individual Defendants caused Immunomedics to issue false and misleading statements during the Class Period;
- Whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- Whether the prices of Immunomedics securities during the Class Period were artificially inflated because of the conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

~~114.~~105. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

~~115.~~106. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- The omissions and misrepresentations were material;
- Immunomedics securities are traded in an efficient market;
- The Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- The Company traded on the ~~Nsadaq~~Nasdaq and was covered by multiple analysts;
- The alleged misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased, acquired and/or sold Immunomedics securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

~~116.~~107. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

~~117. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 2430 (1972), as Defendants omitted material information from their Class Period statements in violation of a duty to disclose such information, as detailed above.~~

## ~~IX.~~X. LOSS CAUSATION

~~118.~~108. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

~~119.~~109. Throughout the Class Period, as set forth above, the market price of Immunomedics stock were inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, about the ASCO and the Best of ASCO presentations and that new data or updated results would be presented, which were widely disseminated to the securities markets, investment analysts, and the investing public. The false and misleading statements caused Immunomedics stock to trade at prices in excess of their true value, including the following:

~~a. On April 19, 2016, after the market closed, Defendants touted within a press release the importance of IMMU-122 and updated results would be presented during the upcoming ASCO Annual Meeting in June. These positive statements caused the price of Immunomedics shares to climb $0.02 from a closing price of $2.95 on April 19, 2016 to close at $2.97 on April 20, 2016 – a gain of about .7% – and to continue to climb during the next several trading days.~~

~~b. On April 29, 2016, Defendant Goldenberg presented some IMMU-132 data at the 12th Annual Protein and Antibody Engineering Summit (PEGS) Boston conference and issued a press release discussing some of the results presented. These positive statements caused the price of Immunomedics shares to climb $0.13 from a closing price of $3.55 on April 29, 2016 to close at $3.68 on May 2, 2016 – a gain of about 3.6%.~~

~~c.~~a. On May 2, 2016, Defendants promoted in a press release the selection of IMMU-132 into "The Best of ASCO" program, which features top abstracts from the ASCO Annual Meeting, to be held on June 24 and June 25, 2016 and the importance of this recognition. These positive statements and omissions of having violated ASCO's embargo rule caused the price of Immunomedics shares to continue to climb another $0.07 from a closing price of $3.68 on May 2, 2016 to close at $3.75 on May 3, 2016 – a gain of about 2%.

~~d.~~b. On May 5, 2016, Defendants hosted a conference call with securities analysts during which they again touted the upcoming ASCO presentations, presenting updated IMMU-132 data, and their search for an IMMU-132 licensing agent or partner towards commercializing the product. These positive statements and omissions of having violated ASCO's embargo rule caused the price of Immunomedics shares to climb $0.16 from a closing price of $3.46 on May 5, 2016 to close at $3.62 on May 6, 2016 – a gain of about 4.6%. The price of Immunomedics shares continued to climb another $0.24 from the May 6, 2016 closing price of $3.62 – a gain of about 6.6%.

~~e.~~c. On May 19, 2016, Defendants touted in a press release the upcoming ASCO presentations during which the Company would present updated IMMU-132 data.

These positive statements and omissions of having violated ASCO's embargo rule caused the price of Immunomedics shares to climb $0.32 from a closing price of $3.85 on May 18, 2016 to close at $4.17 on May 19, 2016 – a gain of about 8.3%.

~~f.~~d. As the June ASCO meetings approached, Defendants statements' and omissions and omissions of having violated ASCO's embargo rule caused the price of Immunomedics shares to climb $1.13 from a closing price of $4.17 on May 19, 2016 to close at $5.30 on June 2, 2016 – a gain of about 27%.

~~120.~~110. As a result, Lead Plaintiff purchased Immunomedics stock at artificially inflated prices. When the truth about Immunomedics's presentation to ASCO and Best of ~~ACSCO~~ASCO conferences, and the lack of new data or updated results, was revealed to the market through several partial disclosures, the price of Immunomedics stock declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was removed from the price of Immunomedics stock, thereby causing substantial damages to the Lead Plaintiffs and the Class, including the following partial disclosures:

a. On June 3, 2016, Defendants announced ASCO's discovery that Defendants violated ASCO's embargo policy by presenting IMMU-132 results at a conference in April 2016. This revelation caused the price of Immunomedics shares to fall $0.68 from a closing price of $5.30 on June 2, 2016 to close at $4.52 on June 3, 2016 – a loss of about 14.7%. At the same time Defendants stated the information was different from that presented in April.

b. On June 21, 2016, Defendants disclosed that Defendant Pfreundschuh resigned as CFO. That day, Wells Fargo downgraded its rating of Immunomedics from Market Perform from Outperform, reduced its valuation range to $1.75 to $2.25 from $8 -

$9 following news of the CFO's resignation "and a series of management missteps that have shaken our confidence in IMMU's ability to create sustainable shareholder value." These revelations caused the price of Immunomedics shares to fall $0.05 from a closing price of $2.53 on June 20, 2016 to close at $2.48 on June 21, 2016 – a loss of about 2%.

c. By June 27, 2016, when the Best of ASCO program concluded without a presentation of IMMU-132 (as Defendants repeatedly touted), the price of Immunomedics shares had fallen $3.30 from a closing price of $5.30 on June 2, 2017 to close at $2.00 on June 27, 2016 – a loss of about 62.3%.

## ~~X.~~XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

~~121.~~111. At all relevant times, the market for Immunomedics common stock was an efficient market for the following reasons, among others:

a. Immunomedics common stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. as a regulated issuer, Immunomedics filed periodic public reports with the SEC and the Nasdaq;

c. Immunomedics regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Immunomedics was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

~~122.~~112. As a result of the foregoing, the market for Immunomedics common stock promptly digested current information regarding Immunomedics from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Immunomedics stock during the Class Period suffered similar injury through their purchase of Immunomedics common stock at artificially inflated prices and/or their purchase of Immunomedics call options or sale of Immunomedics put options at prices tied to the artificially inflated price of Immunomedics's common stock, and a presumption of reliance applies.

## ~~XI.~~XII. ADDITIONAL SCIENTER ALLEGATIONS

~~123.~~113. As alleged herein, Defendants acted with scienter in that they knew that the statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Immunomedics, their control over, and/or receipt and/or modification of Immunomedics's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Immunomedics, participated in the fraudulent scheme alleged herein.

~~124.~~114. Individual Defendant Pfreundschuh signed the Company's May 4, 2016 Form 10-Q filing and made false representations to investors in conference calls, press releases and public statements during the Class Period.

~~125.~~115. For instance, in Immunomedics's May 4, 2016 press release, Individual Defendant Pfreundschuh explicitly stated that: "Key updates in triple-negative breast cancer, as well as non-small-cell and small-cell lung cancers will be provided at ASCO next month~~"~~."

~~126.~~116. Individual Defendant Pfreundschuh made this statement knowing that: 1) the updates he was referring to had already been publicly revealed in April, and that there were no updates since then; 2) Defendants were bound by ASCO's embargo policy; and 3) Defendants had breached that embargo by presenting their abstract data at another conference prior to the ASCO June 2016 conference.

~~127.~~117. Individual Defendants Sullivan and Goldenberg would sell their own shares of Immunomedics each year in June, just as the ASCO Effect was fully underway. Together, their total income in stock, salary, and benefits, paid by IMMU since 2000 amounted to nearly 15% of IMMU market cap by December 2016. Individual Defendants Sullivan and Goldenberg were motivated to, and did in fact, take advantage of the ASCO Effect by: 1) making false and/or materially misleading statements in the run up to the annual ASCO conference; and 2) selling their own shares just when they expected that their statements, in conjunction with the ASCO effect, would have the maximum impact on share prices.

~~128.~~118. Individual Defendants Pfreundschuh, Sullivan, and Goldenberg were further motivated to, and did in fact, conceal both the previous disclosure of Immunomedics's abstract data in April 2016 and the corresponding breach of the ASCO embargo agreement because the disclosure of this information would mean that there would be no unveiling of unseen, innovative data at the ASCO conference. This would undermine investor confidence in Immunomedics, causing the value of IMMU shares to plummet, and prevent Individual

Defendants Sullivan and Goldenberg from obtaining the maximum value for their shares just at the point when they are expecting (or have planned) to sell their shares.

## ~~XII.~~XIII. NO SAFE HARBOR

~~129.~~119. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Immunomedics who knew that those statements were false when made.

## ~~XIII.~~XIV. CAUSES OF ACTION

### Count I (Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

~~130.~~120. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

~~131.~~121. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

~~132.~~122. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in

acts, transactions, practices and courses of business which operated as a fraud and deceit on Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Immunomedics securities; and (iii) cause Lead Plaintiff and other Class members to purchase or otherwise acquire Immunomedics securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

~~133.~~123. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements described above, including statements made to securities analysts and the media that were designed to influence the market for Immunomedics securities. Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented facts about Immunomedics's core operation.

~~134.~~124. By virtue of their positions at Immunomedics, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and other members of the Class, or, in the alternative, they acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions

of Defendants were willfully committed or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

~~135.~~125. The Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Immunomedics securities from their personal portfolios and to personally and directly benefit from successfully licensing the IMMU-132 patent to a third party.

~~136.~~126. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior officers and/or directors of Immunomedics, the Individual Defendants had knowledge of the details of Immunomedics's core operation.

~~137.~~127. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of Immunomedics's statements. As senior officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Immunomedics's business, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Immunomedics securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Immunomedics's business and financial condition that Defendants concealed, Lead Plaintiff and the other Class members purchased or otherwise acquired Immunomedics securities at artificially inflated prices and relied upon the price of the

securities, the integrity of the market for the securities and/or upon Defendants' statements, and were damaged thereby.

~~138.~~128. During the Class Period, Immunomedics securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on Defendants' materially false and misleading statements described herein, purchased or otherwise acquired securities of Immunomedics at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired Immunomedics securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Immunomedics securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Immunomedics securities sharply dropped upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

~~139.~~129. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

~~140.~~130. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that Defendants disseminated misrepresented statements to the investing public.

**Count II (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

~~141.~~131. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

~~142.~~132. During the Class Period, the Individual Defendants participated in the operation and management of Immunomedics, and conducted and participated, directly and indirectly, in the conduct of Immunomedics's business affair. Because of their senior positions, they knew the adverse non-public information about Immunomedics's misstatements.

~~143.~~133. As senior officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Immunomedics's business and to promptly correct any public statements issued by Immunomedics that became false or misleading.

~~144.~~134. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the content of various reports, press releases and public filings that Immunomedics disseminated in the market place during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Immunomedics to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the alleged unlawful conduct that artificially inflated the market price of Immunomedics securities.

~~145.~~135. Each of the Individual Defendants, therefore, acted as a controlling person of Immunomedics. By reason of their senior officer positions and/or being directors of Immunomedics, each Individual Defendant had the power to, and did, direct Immunomedics's alleged unlawful actions and the conduct complained of herein. Each Individual Defendant exercised control over the general and core operation of Immunomedics and possessed the power to control the specific activities comprising the primary violations about which Lead Plaintiff and the other Class members complain.

~~146.~~136. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Immunomedics.

## ~~XIV.~~XV. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other relief as this Court may deem just and proper.

## ~~XV.~~XVI. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: ~~October 4, 2017~~June 3, 2019

Respectfully submitted,

**LITE DEPALMA GREENBERG, LLC**

By: */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for the Class*

Reed R. Kathrein (admitted *Pro Hac Vice* ~~applied for~~)
~~Peter~~Danielle Smith
Lucas E. ~~Borkon (*Pro Hac Vice*)~~Gilmore
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
~~peterb~~danielles@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Lead Counsel for the Class*